Richard ST. CLOUD, Petitioner,

v.

UNITED STATES of America,
Respondent.

No. 87-3023.

United States District Court,
D. South Dakota, C.D.

Dec. 1, 1988.

Albert C. Jones, Dakota Plains Legal Services, Mission, S.D., for petitioner.

Mikal Hanson, Asst. U.S. Atty., Pierre, S.D., for respondent.

## MEMORANDUM OPINION

DONALD J. PORTER, Chief Judge.

■ Petitioner Richard Norman St. Cloud was indicted on counts of rape under 18 U.S.C. §§ 1153[1] and 2031[2] and oral sodomy under 18 U.S.C. § 1153 and SDCL 22–22–1(1) and 22–22–2.[3] St. Cloud plead guilty in this Court to involuntary sodomy and was sentenced to 25 years imprisonment.[4] St. Cloud has filed under 28 U.S.C. § 2255 a motion in which he argues that this Court lacked jurisdiction to convict him. Specifically, St. Cloud contends that because he is enrolled in a terminated Indian tribe, he is not an "Indian" and thus cannot be tried in federal court for a crime against a non-Indian. This Court holds that St. Cloud is not subject to federal criminal jurisdiction under the circumstances of this case.

### I. FACTS

Richard St. Cloud's nationality is approxi-

---

1. In relevant part 18 U.S.C. § 1153, known as the Major Crimes Act, states:

 Any Indian who commits against the person or property of another Indian or other person ... a felony under Chapter 109A [sex crimes] ... shall be subject to the laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

2. 18 U.S.C. § 2031 reads:

 Whoever, within the special maritime and territorial jurisdiction of the United States, commits rape shall suffer death, or imprisonment for any term of years or for life.

3. The reference in the indictment to South Dakota law prohibiting involuntary sodomy implicitly relies upon 18 U.S.C. § 13, known as the Assimilative Crimes Act. The Assimilative Crimes Act incorporates state law to fill gaps in the federal criminal law applicable to areas like Indian reservations and military bases. *See generally United States v. Sharpnack*, 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958); *United*

*States v. Marcyes*, 557 F.2d 1361 (9th Cir.1977) (§ 13 applicable to Indian country). The failure of the indictment to expressly cite § 13 is not prejudicial error since the indictment clearly gave sufficient notice to St. Cloud of the charged offenses and jurisdictional theory. *See generally United States v. Fesler*, 781 F.2d 384 (5th Cir.1986), *cert. denied*, 476 U.S. 1118, 106 S.Ct. 1977, 90 L.Ed.2d 661 (reviewing what is sufficient pleading pursuant to Assimilative Crimes Act); *United States v. John*, 587 F.2d 683, 688 (5th Cir.1979), *cert. denied*, 441 U.S. 925, 99 S.Ct. 2036, 60 L.Ed.2d 399. Moreover, Rule 12(b)(2) of the Federal Rules of Criminal Procedure requires a defendant to challenge before trial such a defect in the indictment. *Sewell v. United States*, 406 F.2d 1289, 1292 (8th Cir.1969). That § 13 rather than § 1153 provides the basis by which to incorporate the state criminal provisions does not alter the analysis of whether St. Cloud is subject to federal jurisdiction.

4. *United States v. St. Cloud*, CR86–30026–01.

mately $^{15}/_{32}$ Yankton Sioux and $^{7}/_{16}$ Ponca.[5] His father is a member of the Yankton Sioux Tribe, and his mother is enrolled in the Ponca Indian Tribe of Nebraska.

Early in his life, St. Cloud became an enrolled member of the Ponca Indian Tribe. On September 5, 1962, Congress passed legislation to "terminate" the Ponca Indians pursuant to House Concurrent Resolution 108. *See* 25 U.S.C. §§ 971–980. In accordance with the termination legislation, the Secretary of the Interior compiled a final membership roll and distributed tribal assets to enrolled Ponca Indians. Richard St. Cloud's name appeared on the final roll, and through his parents, St. Cloud received proceeds from the asset distribution.

St. Cloud later moved to the Lower Brule Sioux Indian Reservation where he lived from 1973 until 1986. St. Cloud married an enrolled member of the Lower Brule Sioux Tribe and has several children who also are tribal members. In 1983, St. Cloud applied for enrollment in the Yankton Sioux Tribe. The tribe, however, rejected his application because a provision in the tribe's constitution prohibited St. Cloud from becoming a member since he was enrolled with the terminated Ponca tribe and had received assets from a tribal judgment fund upon Ponca termination.[6]

As a virtually full-blooded Native American, St. Cloud obviously is ethnically an Indian. He is socially recognized and lives as a Native American. In addition, St. Cloud has participated in the Yankton Sioux Tribe's alcohol treatment and counseling programs and has occasionally benefitted from Indian health care. However, due to his membership in a terminated tribe, St. Cloud receives no federal general assistance benefits. St. Cloud, since he is not eligible for full membership in the

tribe, cannot vote in tribal elections and does not receive top priority in tribal job assistance programs. St. Cloud benefits from tribal housing and job assistance solely because he is married to a tribal member.

According to the grand jury indictment, St. Cloud forcibly raped and committed involuntary sodomy on an alcohol abuse counselor on April 16, 1986. The counselor had magnanimously offered to drive St. Cloud to a friend's house after counselling St. Cloud. Near the Old Nation Church on the Lower Brule Indian Reservation, St. Cloud, at knife point, forced the treatment counselor out of her car and into an abandoned house where St. Cloud raped her. The treatment counselor is not an Indian.

## II. REVIEW UNDER 28 U.S.C. § 2255

St. Cloud has chosen to challenge federal criminal jurisdiction over his case by filing a motion under 28 U.S.C. § 2255. Section 2255 specifically provides relief for circumstances when the sentencing court lacked jurisdiction. St. Cloud's failure to present a jurisdictional argument at a prior stage of the proceedings does not prevent him from collaterally attacking the sentence under § 2255. *Thor v. United States*, 554 F.2d 759 (5th Cir.1977). Similarly, St. Cloud's plea of guilty to a federal offense does not waive a lack of subject matter jurisdiction. *See United States v. Gotches*, 547 F.2d 80, 82 (8th Cir.1977); *United States v. Broncheau*, 597 F.2d 1260, 1262 n. 1 (9th Cir.1979), *cert. denied*, 444 U.S. 859, 100 S.Ct. 123, 62 L.Ed.2d 80. St. Cloud's claim that he is not an Indian under 18 U.S.C. § 1153 raises a question about subject matter jurisdiction of this Court to accept the guilty plea and sentence St. Cloud. *United States v. Heath*,

---

5. On April 1, 1988, this Court held an evidentiary hearing to probe St. Cloud's claim that he is not an Indian subject to federal criminal jurisdiction. At the hearing, Edwin Miller, the superintendent for the Bureau of Indian Affairs' Lower Brule Agency, *testified that BIA records* showed St. Cloud to be $^{15}/_{32}$ Yankton Sioux and $^{7}/_{16}$ Ponca. St. Cloud testified that he was $^{7}/_{16}$ Ponca and $^{9}/_{16}$ Yankton Sioux and thus ethnically a full-blooded Indian.

6. Article IV, § 1(b) of the Yankton Sioux Tribe's constitution states:

The following persons shall not be eligible for enrollment with the Yankton Sioux Tribe:
1. Persons who are enrolled with another Tribe of Indians and who have shared as members in allotments of land/or payments, excluding inherited interests, from any other tribe.

509 F.2d 16, 19 (9th Cir.1974). Therefore, this Court is obliged under § 2255 to determine whether St. Cloud is an "Indian" subject to federal criminal jurisdiction.

## III. CRIMINAL JURISDICTION OVER NATIVE AMERICANS

It is axiomatic that the federal government has a special trust relationship with Native Americans under which the United States bears a particular responsibility for preserving and protecting the Indian people. To sustain these obligations, Congress has "plenary power" over Native Americans, though the tribes constitute separate sovereigns from the federal government. In pursuance of its responsibilities and power, Congress has passed several laws establishing a jurisdictional framework for crimes involving Native Americans in Indian country. Under this framework, three distinct sovereign entities—the state, federal government, and tribe—share criminal jurisdiction. Determining which sovereign or sovereigns have jurisdiction turns on a two-step inquiry: 1) where the offense took place; and 2) whether the defendant or victim was Indian or non-Indian.

### A. *Situs of the Crime.*

██ Federal courts possess jurisdiction over Indian crimes only within Indian country.[7] State courts have exclusive criminal jurisdiction over crimes occurring outside of Indian country. Similarly, where Congress has specifically granted jurisdiction over Indian country to state courts through special grants like Public Law 280, state courts possess jurisdiction.

██ St. Cloud's criminal acts clearly occurred in Indian country on the Lower Brule Sioux Indian Reservation. *See* 18 U.S.C. § 1151 (defining "Indian country"); *Donnelly v. United States,* 228 U.S. 243, 269, 33 S.Ct. 449, 458, 57 L.Ed. 820 (1913) (nothing more appropriately deemed Indian country than land set apart as Indian reservation). Congress has not chosen to sub-

ject the Lower Brule Sioux Indian Reservation to state court criminal jurisdiction. Therefore, the crime did not occur on territory where an offense of rape would be within the exclusive jurisdiction of a state court.

### B. *Defendant–Victim Categorization.*

██ Criminal jurisdiction in Indian country does not rely on a racial classification but depends on whether a person enjoys the unique status of sufficient links to a formerly sovereign nation to be an "Indian." *United States v. Antelope,* 430 U.S. 641, 646, 97 S.Ct. 1395, 1398–99, 51 L.Ed.2d 701 (1977). To determine which sovereign has jurisdiction over a particular offense, a court must evaluate whether the defendant and victim is Indian or non-Indian. If both defendant and victim are Indians, state courts do not have jurisdiction, and federal and tribal courts share jurisdiction. If the defendant is a non-Indian and the victim is an Indian, federal courts have exclusive jurisdiction over the offense. *See* D. Getches & C. Wilkinson, Federal Indian Law 412–15 (2d ed.1986). Since St. Cloud's victim was not an Indian, the offense at hand does not fit into either of these first two categories. *See generally Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978).

If St. Cloud is an Indian, state courts have no jurisdiction to prosecute him for the rape of the non-Indian counselor. *See, e.g., United States ex rel. Condon v. Erickson,* 478 F.2d 684 (8th Cir.1973). (South Dakota has no jurisdiction to convict Indian for rape of non-Indian committed in Indian Country). The federal courts have jurisdiction under the Major Crimes Act, the Indian Country Crimes Act and the Assimilative Crimes Act. *See United States v. John,* 587 F.2d 683, 686–87 (5th Cir.1979), *cert denied,* 441 U.S. 925, 99 S.Ct. 2036, 60 L.Ed.2d 399. Tribal courts may have concurrent jurisdiction.

---

7. Federal crimes such as mail fraud are, of course, the exception to this rule. Because St. Cloud's offense does not involve such an exclusively federal offense, this Court will overlook such offenses for purposes of setting forth the framework for criminal jurisdiction in Indian country.

However, if St. Cloud is not an Indian, state courts have exclusive jurisdiction to prosecute him for a crime against a non-Indian. Federal and tribal courts lack jurisdiction over a crime in which both the victim and the defendant are non-Indians. *United States v. McBratney*, 104 U.S. 621, 624, 26 L.Ed. 869 (1881); *see also United States v. Wheeler*, 435 U.S. 313, 324 n. 21, 98 S.Ct. 1079, 1087 n. 21, 55 L.Ed.2d 303 (1978). Therefore, whether St. Cloud is an "Indian" for purposes of federal criminal jurisdiction is determinative of jurisdiction over St. Cloud.

## IV. "INDIAN" FOR PURPOSES OF CRIMINAL JURISDICTION

### A. *The Meaning of "Indian".*

The word "Indian" has become a legal term of art with varying definitions depending on the context. Clinton, *Criminal Jurisdiction over Indian Lands: A Journey Through a Jurisdictional Maze*, 18 Ariz.L.Rev. 503, 515 (1976). Though there are a variety of statutory definitions of "Indian",[8] Congress has not defined "Indian" as used in the statutes governing criminal jurisdiction. In *United States v. Rogers*, 45 U.S. (4 How.) 567, 11 L.Ed. 1105 (1846), the Supreme Court suggested that a person not only had to abide by Indian customs, but also had to have Indian blood in order to be an Indian. The Court in *Rogers* held that a white man could not become an Indian despite the man's adoption into the Cherokee Indian Tribe. The Court thus held the man to be subject to criminal jurisdiction. A number of courts have read *Rogers* to establish a two-part test of whether a person is an Indian under federal criminal jurisdiction by inquiring whether a person has some Indian blood and whether the person is recognized as an Indian. *United States v. Broncheau*, 597 F.2d 1260, 1263 (9th Cir.1979), *cert. denied*, 444 U.S. 859, 100 S.Ct. 123, 62 L.Ed.2d 80; *United States v. Dodge*, 538 F.2d 770, 786 (8th Cir.1976), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1118, 1119, 51 L.Ed.2d 547; *United States v. Torres*, 733 F.2d 449, 456 (7th Cir.1984), *cert. denied*, 469 U.S. 864, 105 S.Ct. 204, 83 L.Ed.2d 135; *State v. Attebery*, 110 Ariz. 354, 519 P.2d 53 (1974); *Idaho v. Bonaparte*, 759 P.2d 83 (Idaho Ct.App.1988); *Goforth v. State*, 644 P.2d 114, 116 (Okla.Crim.App.1982).

### B. *The Rogers Requirements.*

#### 1. Indian Blood.

Even assuming away St. Cloud's Ponca heritage,[9] St. Cloud's $15/32$ of Yankton Sioux blood is sufficient to satisfy the first requirement of having a degree of Indian blood. *Cf., Goforth*, 644 P.2d at 116 (requirement of Indian blood satisfied by testimony that person was slightly less than one-quarter Cherokee Indian); *Vezina v.*

---

8. For example, the Indian Reorganization Act at 25 U.S.C. § 479 defines "Indian" to mean "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood." The Indian Financing Act, 25 U.S.C. § 1452, defines Indian to mean "a member of any Indian tribe ... which is recognized by the Federal Government as eligible for services from the BIA." Similarly, 25 C.F.R. § 11.2(c) defines Indian for purposes of jurisdiction of Courts of Indian offenses as "any person of Indian descent who is a member of any recognized Indian tribe now under federal jurisdiction." 25 U.S.C. § 2008(f) extends the definition of "Indian" to those having at least ¼ Indian blood descendant from a tribal member. 25 U.S.C. § 345 treats as an Indian for allotment purposes any person "in whole or in part of

Indian blood or descent." Finally, 42 C.F.R. § 36.12 for purposes of Indian eligibility for Indian Health Service defines as Indian anyone so recognized in the community in which he or she lives.

The National American Indian Court Judges Association has proposed enactment of legislation to define "Indian" for purposes of federal criminal jurisdiction. The Association's proposed definition would encompass enrolled members of terminated tribes. 4 Nat'l Am. Indian Court Ass'n, Justice and the American Indian 61–62 (1974).

9. The effect of Ponca termination is to make enrolled Ponca Indians the legal equivalent of non-Indians. Since St. Cloud was enrolled as a Ponca at termination, termination in essence renders St. Cloud's Ponca heritage nugatory with respect to the law. St. Cloud of course remains ethnically a Ponca Indian despite Ponca termination.

*United States,* 245 F. 411 (8th Cir.1917) (women ¼ to ⅜ Chippewa Indian held to be Indian); *Sully v. United States,* 195 F. 113 (8th Cir.1912) (⅛ Indian blood held sufficient to be Indian); *Makah Indian Tribe v. Clallam County,* 73 Wash.2d 677, 440 P.2d 442 (1968) (¼ Makah blood sufficient to satisfy first prong of *Rogers* test).

■ However, Indian blood alone is not enough to warrant federal criminal jurisdiction because jurisdiction over Indians in Indian country does not derive from a racial classification but from the special status of a formerly sovereign people. *United States v. Antelope,* 430 U.S. 641, 646, 97 S.Ct. 1395, 1398–99, 51 L.Ed.2d 701 (1977); F. Cohen, Handbook of Federal Indian Law 19 (1982 ed.). The second prong of the *Rogers* test in essence probes whether the Native American has a sufficient non-racial link to a formerly sovereign people.

2. Non-racial Recognition as an Indian.

■ Several courts have phrased the second inquiry derived from *Rogers* as whether the person is recognized as an Indian by the tribe *or* federal government. *See Broncheau,* 597 F.2d 1260, 1263 (9th Cir. 1979), *cert. denied,* 444 U.S. 859, 100 S.Ct. 123, 62 L.Ed.2d 80; *Goforth,* 644 P.2d at 116. No court, however, has carefully analyzed what constitutes sufficient non-racial recognition as an Indian. This Court nonetheless has gleaned from case law several factors to evaluate whether a person satisfies the second prong of *Rogers.* In declining order of importance, these factors are: 1) enrollment in a tribe; 2) government recognition formally and informally through providing the person assistance reserved only to Indians; 3) enjoying benefits of tribal affiliation; and 4) social recognition as an Indian through living on a reservation and participating in Indian social

life.[10] These factors do not establish a precise formula for determining who is an Indian. Rather, they merely guide the analysis of whether a person is recognized as an Indian.

*Enrollment in a Tribe*

■ On several occasions, courts have found tribal enrollment alone sufficient proof that a person is an Indian. But a person may still be an Indian though not enrolled with a recognized tribe. *United States v. Broncheau,* 597 F.2d 1260, 1263 (9th Cir.1979), *cert. denied,* 444 U.S. 859, 100 S.Ct. 123, 62 L.Ed.2d 80; *United States v. Ives,* 504 F.2d 935, 953 (9th Cir. 1974), *vacated on other grounds,* 421 U.S. 944, 95 S.Ct. 1671, 44 L.Ed.2d 97 (1975); *Ex parte Pero,* 99 F.2d 28, 31 (7th Cir.1938), *cert. denied,* 306 U.S. 643, 59 S.Ct. 581, 83 L.Ed. 1043 (1939). St. Cloud is enrolled in the Ponca Indian Tribe, but the tribe has been terminated. The Yankton Sioux Indian Tribe has denied St. Cloud membership in the tribe because St. Cloud as an enrolled Ponca Indian participated in a judgment fund. This Court finds that in this case, tribal enrollment is not determinative of whether St. Cloud is an Indian.

*Government Recognition*

At the evidentiary hearing held on April 1, 1988, Edwin Miller, the superintendent for the BIA's Lower Brule agency, testified that the government considers St. Cloud a terminated Indian and thus does not provide St. Cloud with benefits reserved to Indians under the special federal trust obligation to Indians. For example, St. Cloud receives no general assistance benefits. However, St. Cloud has obtained treatment at a Chamberlain hospital under the federal Indian Health Services program,[11] though this medical care may have been inadver-

---

**10.** This Court explicitly declines to include in this calculus whether the Indian is enrolled in a terminated tribe for two reasons. First, the termination inquiry is somewhat subsumed in evaluating whether there is formal government recognition. And, second, the effect of termination on a person's status as an Indian is best left to separate analysis since termination applies to a relatively small number of Indians and Congress enacted individual termination

statutes for each terminated tribe. This Court analyzes the effect of termination of the Ponca Indians on St. Cloud's status as an Indian in Part V.

**11.** Under the Indian Health Services arrangement, the Chamberlain hospital contracts with the BIA to furnish Indians medical care.

tantly provided. St. Cloud has received federal housing assistance, but this assistance was furnished to St. Cloud because he is married to a tribal member and is the father of several tribal members. A non-Indian may benefit from such federal housing if the non-Indian is married to an Indian, is the parent of several tribal members, and resides on the reservation.

### Enjoying Benefits of Tribal Affiliation

St. Cloud has benefitted from several tribal programs. Most notably, St. Cloud participated in a tribal alcohol treatment and counseling program. St. Cloud also obtained employment through a tribally-administered employment program, though St. Cloud did not enjoy top priority in the employment program since he was not a member of the tribe.

### Social Recognition as an Indian

St. Cloud is socially recognized as an Indian. He lives on the Lower Brule Indian Reservation in federally provided housing, is a member of the Indian community, and participates in Indian social life. St. Cloud identifies himself as an Indian, and is not at all integrated into non-Indian society.

### C. Whether St. Cloud is an "Indian".

The factors analyzed above guide this Court to conclude that, under the *Rogers* analysis of the meaning of "Indian" and apart from determining the effect of termination on St. Cloud's status, St. Cloud is an Indian. This conclusion serves the purposes of federal criminal jurisdiction over Indians as a brief review of federal law reveals.

Congress enacted federal criminal statutes in pursuance of the federal trust relationship to fulfill three purposes: to prevent lawlessness in Indian country, to fill gaps in criminal jurisdiction,[12] and to shelter Native Americans from the possible

biases of local courts. A broad construction of "Indian" to extend federal criminal jurisdiction in Indian country benefits Native Americans by advancing these three goals. Moreover, a broad construction of statutes like 18 U.S.C. §§ 13, 1152, and 1153 is consistent with the maxim that statutes should be construed to favor Native Americans. *DeCoteau v. District County Court*, 420 U.S. 425, 447, 95 S.Ct. 1082, 1094, 43 L.Ed.2d 300 (1975); *see also* Wilkinson & Biggs, *The Evolution of the Termination Policy*, 5 Am.Ind.L.Rev. 139, 152–53 (1977) ("Indians have always argued for federal and tribal authority over reservation Indians because of long-standing discriminatory practices by local officials. Reliable authorities indicate that those claims of local hostility are warranted.") Generally, an ethnic Indian with ties to a tribe like St. Cloud comes within the group of individuals to whom the Government bears a special fiduciary responsibility. *See Seminole Nation v. United States*, 316 U.S. 286, 297, 62 S.Ct. 1049, 1054–55, 86 L.Ed. 1480, 1777 (1942). However, since St. Cloud is an enrolled member of a terminated tribe, this Court must consider whether the Government has ended its special trust relationship with St. Cloud.

### V. THE EFFECT OF PONCA TERMINATION ON ST. CLOUD

### A. History and Purpose of Termination.

In the 1940s, critics of Franklin Roosevelt's Indian policy began urging complete assimilation of Indians into white society. This movement culminated in 1953 with the passage of House Concurrent Resolution 108 articulating the termination policy. House Concurrent Resolution 108 expressed the goal of termination as follows:

... it is the policy of Congress, as rapidly as possible, to make the Indians within

---

**12.** The Major Crimes Act, for instance, was passed as a reaction to *Ex parte Crow Dog*, 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030 (1983). In *Crow Dog*, the Supreme Court held that federal jurisdiction did not extend to an Indian who killed a fellow Indian in Indian country. Congress' goal in passing the Major Crimes Act clearly was to prevent lawlessness in Indian

lands and to plug gaps in criminal jurisdiction. *See* Statement of Rep. Cutcheon, 16 Cong.Rec. 934 (1885). For a more detailed history of the Major Crimes Act, see *Keeble v. United States*, 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973); *United States v. Welch*, 822 F.2d 460 (4th Cir.1987).

the same laws and entitled to the same privileges and responsibilities as are applicable to other citizens of the United States, to end their status as wards of the United States, and to grant them all of the rights and prerogatives pertaining to American citizenship....

H.R.Con.Res. 108, 83rd Cong., 1st Sess., 67 Stat. B132 (1953). To implement the policy expressed in HCR 108, Congress passed some thirteen individual acts to terminate Indian tribes.[13] In 1954, Congress voted to terminate the Ponca Indian Tribe of Nebraska, and termination legislation for the Poncas was finalized in 1962. Act of Sept. 5, 1962, Pub.L. No. 87–629, 76 Stat. 429 (codified at 25 U.S.C. §§ 971–80).

### B. *Ponca Termination.*

The Ponca termination statute closely resembles other termination enactments. The Act directs the Secretary of Interior to prepare a final roll of tribal members and to distribute certain tribal funds and assets to Poncas on the final roll.[14] 25 U.S.C. § 972, 73. The Act's final provision stated:

> When the distribution of tribal assets in accordance with the provisions of this Act has been completed, the Secretary of the Interior shall publish in the Federal Register a proclamation declaring that the Federal trust relationship to [the Ponca Indian Tribe] and its members has terminated. Thereafter, the tribe and its members shall not be entitled to any of the special services performed by the United States for Indians or Indian tribes because of their Indian status, all statutes of the United States that affect

Indians or Indian tribes because of their Indian status shall be inapplicable to them, and the laws of the several states shall apply to them in the same manner they apply to other persons or citizens within their jurisdiction....

25 U.S.C. § 980.

The Secretary of the Interior proclaimed the distribution of assets complete on October 26, 1966. 31 Fed.Reg. No. 209 (Oct. 27, 1966). The Secretary's proclamation restated language in the termination act that federal statutes pertaining specially to Indians no longer applied to enrolled Ponca members and that state law would apply to enrolled Poncas as if they were non-Indians. The published final roll of the Ponca Tribe included Richard Norman St. Cloud, recorded as a male born October 27, 1947 who is 7/16 Ponca. 31 Fed.Reg. 8235 (June 26, 1965). The Ponca Termination Act, therefore, includes St. Cloud in its effect.

### C. *Judicial Interpretation of Termination Acts.*

On several occasions, courts have explored the ramifications of termination. In *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), the Supreme Court determined that termination of the Menominee Tribe did not abrogate tribal rights to hunt and fish under the Wolf River Treaty of 1854. The Court read the Menominee termination act in pari materia with Public Law 280,[15] which expressly safeguarded tribal hunting and fishing rights while extending Wisconsin jurisdiction over the Me-

---

**13.** For a list of termination statutes, see *United States v. Burland*, 441 F.2d 1199 (9th Cir.1971), *cert. denied*, 404 U.S. 842, 92 S.Ct. 137, 30 L.Ed. 2d 77; *see also* F. Cohen, Handbook of Federal Indian Law 173–74 (1982 ed.); F. Prucha, The Great White Father: The United States Government and the American Indians 1048 (1984). According to two commentators, the effect of the thirteen termination acts was to terminate 109 tribes and bands containing 11,466 individuals or about 3% of the Indian population at the time. Wilkinson & Biggs, *The Evolution of the Termination Policy*, 5 Am.Ind.L.Rev. 139, 151 (1977).

**14.** According to the Report of the House Committee on Interior and Insular Affairs, the Pon-

ca Tribe of Nebraska had approximately 525 members at the time of termination. H.R.Rep. No. 2076, 87th Cong., 2d Sess. (July 31, 1962). The termination legislation purportedly had the support of the tribe. *See* Minutes of Meeting of Ponca Tribe of Native Americans at Community Building, Niobrara, Nebraska on September 23, 1958 at 7 p.m., *reprinted in*, S.Rep. No. 1623, 87th Cong., 2d Sess. (June 25, 1962). However, tribal consent to termination of the tribe has to be viewed skeptically.

**15.** PL 280 transferred jurisdiction over certain tribes to a few states in 1953. PL 280 as amended is codified in part at 18 U.S.C. § 1162(a) and 28 U.S.C. § 1360(a).

nominee. *Id.* at 410–12, 88 S.Ct. at 1709–11. The Court concluded that the termination act ended federal supervision, but did not extinguish treaty rights. *Id.* at 412–13, 88 S.Ct. at 1711.

The Supreme Court recently addressed the effect of termination of the Catawba Indian Tribe on a tribal suit alleging wrongful takings of lands secured by two treaties. *South Carolina v. Catawba Indian Tribe, Inc.,* 476 U.S. 498, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986). In *Catawba Indian,* the Court examined the Catawba Termination Act,[16] which closely parallels the Ponca termination statute. The Court stated that Catawba termination was "an intentional termination of the special federal protection for the Tribe and its members; and a plain statement that state law applies to the Catawba as to all 'other persons or citizens.'" *Id.* at 508, 106 S.Ct. at 2045; *see also Bryan v. Itasca County,* 426 U.S. 373, 389, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) (terminated Indians subject to "the full sweep of state laws"); *Klamath & Modoc Tribes v. Maison,* 338 F.2d 620 (9th Cir.1964). The Court in *Catawba Indian* thus concluded that a state statute of limitations applied to the tribe's claim and remanded the case for application of the state limitation. *Id.* 476 U.S. at 510–11, 106 S.Ct. at 2046.

Only one court has addressed the effect of termination on federal criminal jurisdiction. In *United States v. Heath,* 509 F.2d 16 (9th Cir.1974), the Court of Appeals for the Ninth Circuit examined whether Betty Jean Heath, a terminated Klamath Indian, could be convicted under the Major Crimes Act for voluntary manslaughter of her Indian husband. The Court reasoned:

> While anthropologically a Klamath Indian even after the Termination Act obviously remains an Indian, his unique status vis-a-vis the Federal Government no longer exists. Pursuant to 25 U.S.C.

§ 564q, Klamath Indians are subjected to state laws and are to be dealt with by the law no differently than any other citizen of a state. We conclude accordingly that 18 U.S.C. § 1153 cannot serve to confer Federal jurisdiction with respect to crimes committed by terminated Klamath Indians.

*Id.* at 19.[17]

The Supreme Court in dicta has endorsed the *Heath* decision in *United States v. Antelope,* 430 U.S. 641, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977). In *Antelope,* the Court held that the statutory scheme extending federal criminal jurisdiction to "Indians" did not constitute invidious racial discrimination in violation of the equal protection clause of the Constitution since "Indian" in this context was not a solely racial classification. In the midst of its opinion, the Court dropped a footnote to explain that race alone was not determinative of criminal jurisdiction over Indians. In the footnote, the Court stated:

> ... federal jurisdiction under the Major Crimes Act does not apply to "many individuals who are racially to be classified as 'Indians.'" [*Morton v. Mancari,* 417 U.S. 535, 553 n. 24, 94 S.Ct. 2474, 2484 n. 24, 41 L.Ed.2d 290 (1974)]
>
> ... [M]embers of tribes whose official status has been terminated by congressional enactment are no longer subject, by virtue of their status, to federal criminal jurisdiction under the Major Crimes Act. *United States v. Heath,* 509 F.2d 16, 19 (9th Cir.1974).

. . . . .

*Antelope,* 430 U.S. at 646–47 n. 7, 97 S.Ct. at 1399 n. 7.

D. *The Effect of Termination on Criminal Jurisdiction over St. Cloud.*

The Ponca termination act sought to end the trust relationship with those Ponca Indians whose names appeared on the final

---

**16.** Congress terminated the Catawba Indians in September 21, 1959, P.L. 86–322, 73 Stat. 592 (codified at 25 U.S.C. §§ 931–38).

**17.** The court in *Heath* nonetheless upheld the conviction, finding that jurisdiction existed under the Indian Country Crimes Act, 18 U.S.C.

§ 1152, since Heath's victim was an Indian. In the instant case, St. Cloud's victim was a non-Indian. Therefore, if St. Cloud is not an "Indian" under federal criminal jurisdiction, this Court lacks jurisdiction. *United States v. McBratney,* 104 U.S. 621, 624, 26 L.Ed. 869 (1882).

roll and thus expose those Indians to state court jurisdiction as if they were non-Indians. St. Cloud's name appeared on the final roll of the terminated Ponca tribe. Consequently, the Act terminated the special relationship between St. Cloud and the federal government.

 Case law confirms the conclusion that the termination act ends the federal trust relationship with St. Cloud and subjects him to state jurisdiction. Courts have found the termination language unequivocal and have given force to Congress' intent to end the trust relationship with enrolled members of terminated tribes and subject Indians to state jurisdiction. *See, e.g., South Carolina v. Catawba Indian Tribe, Inc.,* 476 U.S. 498, 505–06, 106 S.Ct. 2039, 2043–44, 90 L.Ed.2d 490 (1986) (termination provision "unmistakably clear"); *United States v. Heath,* 509 F.2d 16, 19 (9th Cir.1974), *quoting Klamath and Modoc Tribes v. Maison,* 338 F.2d 620, 622 (9th Cir.1964) (termination act terms are "express and unequivocal").[18]

It is true that treaty rights may survive termination as the Court held in *Menominee Tribe of Indians v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968). The Government, however, has presented no argument that St. Cloud's right to legal recognition as an Indian is secured by any treaty. Nevertheless, this Court has perused treaties, statutes, and case law specifically applicable to the Yankton Sioux Tribe in search of a treaty or statute that would assure Yankton Sioux descendants like St. Cloud a special relationship with the federal government that would survive Ponca termination.[19] The most pertinent Yankton Sioux treaty provision is Article XIII of the Agreement with the Yankton Sioux or Dakota Indians. Article XIII of the treaty states:

> All persons who have been allotted lands on the reservation described in this agreement and who are now recognized as members of the Yankton tribe of Sioux Indians, including mixed bloods, whether their white blood comes from the paternal or maternal side, and the children born to them shall enjoy the undisputed and peaceful possession of their allotted lands, and shall be entitled to all the rights and privileges of the tribe enjoyed by full-blood Indians.

Agreement with the Yankton Sioux or Dakota Indian, in South Dakota, *ratified at* 28 Stat. 286, ch. 290 (August 15, 1894).

Courts are to construe treaty rights broadly to resolve doubts in favor of the tribe. *United States v. Shoshone Tribe of Indians,* 304 U.S. 111, 117, 58 S.Ct. 794, 798, 82 L.Ed. 1213 (1938). Even broadly interpreted, Article XIII does not extend a federal trust relationship to St. Cloud that would survive termination. The key language of Article XIII assures "the children born" to allottees "all the rights and privileges of the tribe enjoyed by full-blood Indians." Though St. Cloud might qualify as a "child born" under the treaty, there is no indication that St. Cloud is a descendant of an allottee under the treaty agreement. Moreover, the Yankton Sioux Tribe itself has denied St. Cloud "rights and privileges of the tribe" because of St. Cloud's affil-

---

**18.** Nonetheless, termination acts generally should be narrowly construed to resolve ambiguities in favor of Native Americans. *See Catawba Indian,* 476 U.S. at 526–27, 106 S.Ct. at 2054–55 (Blackmun, J., dissenting) (termination act to be narrowly construed so as not to strain to give force to assimilationist policy rejected in present Indian policy). The provision of the termination act at issue, however, is unambiguous in subjecting Indians whose names appeared on the final Ponca roll to state jurisdiction.

**19.** The Ponca termination statute was an express abrogation of any treaty right secured by the Poncas that might assure St. Cloud the protection of federal criminal jurisdiction. *See*

*Lone Wolf v. Hitchcock,* 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903). The termination legislation, however, does not expressly abrogate treaty provisions of the Yankton Sioux Tribe, which might apply to St. Cloud. *See Menominee Tribe of Indians v. United States,* 391 U.S. 404, 413, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 697 (1968) (Congress must explicitly abrogate treaty rights before courts will find a diminishment of treaty rights); *United States v. Winnebago Tribe of Nebraska,* 542 F.2d 1002, 1004–05 (8th Cir. 1976) ("Rights secured by treaty will not be deemed to have been abrogated or modified absent a clear expression of congressional purpose.").

**1466**

iation with the Ponca Tribe. Article XIII does not lend itself to an interpretation of insuring an allottee's descendant all tribal rights and privileges when the tribe itself has found the descendant not qualified for tribal membership. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 n. 32, 98 S.Ct. 1670, 1684 n. 32, 56 L.Ed.2d 106 (1978) (judiciary to respect tribe's right to decide tribal membership and entitlements). Consequently, Article XIII cannot be read to preserve federal criminal jurisdiction over St. Cloud in light of Ponca termination.

### VI. CONCLUSION

St. Cloud, due to his ties to a recognized Indian tribe, normally would qualify as an Indian subject to federal criminal jurisdiction. However, because St. Cloud was an enrolled member of the Ponca tribe at termination, the Ponca termination statute ended the federal trust relationship with St. Cloud and explicitly exposed St. Cloud to state law as is any other state citizen. Consequently, this Court lacked subject matter jurisdiction to convict St. Cloud since both he and his victim are non-Indians under the law. This Court therefore must grant St. Cloud's writ under 28 U.S.C. § 2255 and set aside this Court's prior rulings. St. Cloud shall be released from federal confinement to the care of the Attorney General of the State of South Dakota. Unless an appeal to the United States Court of Appeals for the Eighth Circuit is timely filed, this order shall take effect on December 31, 1988.