ELMORE, Judge.
 

 *292
 
 Defendant George Lee Nobles, a non-enrolled member of any federally recognized Native American
 
 [1]
 
 tribe but a first descendant of an enrolled member of the Eastern Band of Cherokee Indians ("EBCI"), appeals from judgments sentencing him to life in prison after a North Carolina jury convicted him of armed robbery, first-degree felony murder, and firearm possession by a felon.
 

 He argues the trial court erred by (1) denying his motions to dismiss the charges on the grounds that the State of North Carolina lacked subject-matter jurisdiction to prosecute him because he is an "Indian" and thus criminal jurisdiction lie exclusively in federal court under the Indian Major Crimes Act ("IMCA"),
 
 18 U.S.C. § 1153
 
 (2013) ; (2) denying his request to submit the question of his Indian status to the jury for a special verdict on subject-matter jurisdiction; and (3) denying his motion to suppress incriminating statements he made to police during a custodial interview after allegedly invoking his right to counsel. Defendant has also (4) filed a motion for appropriate relief ("MAR") with this Court, alleging that his convictions were obtained in violation of his constitutional rights. Finally, defendant (5) requests we remand the matter to the trial court with instructions to correct a clerical error in its order arresting judgment on the armed-robbery conviction, since although that order lists the correct file number of 12 CRS 1363, it lists the wrong offense of firearm possession by a felon.
 

 As to the first three issues presented, we hold there was no error. As to the MAR, we dismiss the motion without prejudice to defendant's right to file a new MAR in the superior court. As to the clerical error, we remand the matter to the trial court with instructions to correct its order by listing the accurate offense of armed robbery.
 

 I. Background
 

 On 30 September 2012, Barbara Preidt, a non-Indian, was robbed at gunpoint and then fatally shot outside the Fairfield Inn in the Qualla Boundary, land held in trust by the United States for the EBCI. On 30 November 2012, officers of the Cherokee Indian Police Department arrested defendant, Dwayne Edward Swayney, and Ashlyn Carothers for Preidt's robbery and murder. Soon after, tribal, federal, and state prosecutors conferred together to determine which charges would be brought and in which sovereign government criminal jurisdiction was
 
 *134
 
 proper for each defendant. After discovering that Swayney was an enrolled tribal
 
 *293
 
 member of the EBCI, and that Carothers was an enrolled tribal member of the Cherokee Nation of Oklahoma, authorities brought these two defendants before an EBCI tribal magistrate. After discovering that defendant was not an enrolled member of any federally recognized tribe, the three sovereignties agreed that North Carolina would exercise its criminal jurisdiction to prosecute him, and authorities brought defendant before a Jackson County magistrate, charging him with armed robbery, murder, and firearm possession by a felon.
 

 In August 2013, defendant moved to dismiss those charges for lack of jurisdiction. He argued North Carolina lacked subject-matter jurisdiction because he was an Indian, and thus the offenses were covered by the IMCA, which provides for exclusive federal jurisdiction over "major crimes" committed by "Indians" in "Indian Country."
 
 See
 

 18 U.S.C. § 1153
 
 . After a two-day pretrial jurisdictional hearing, the state trial court judge, applying a Ninth Circuit test to determine if someone qualifies as an Indian for purposes of criminal jurisdiction,
 
 see
 

 United States v. Bruce
 
 ,
 
 394 F.3d 1215
 
 (9th Cir. 2005), concluded in a detailed forty-two page order entered on 26 November 2013 that defendant was not an Indian and thus denied defendant's motion to dismiss for lack of subject-matter jurisdiction. On 18 December 2013, the trial court granted defendant's motion to stay criminal proceedings pending resolution of his appeal from its 26 November 2013 order. On 30 January 2014, defendant petitioned our Supreme Court for
 
 certiorari
 
 review of that order, which it denied on 11 June 2014. On 23 June 2014, the trial court dissolved the stay.
 

 In March 2016, defendant moved to suppress incriminating statements he made to police during a custodial interview, which the trial court denied by an order entered
 
 nunc pro tunc
 
 on 24 March. Also in March, defendant renewed his motion to dismiss the charges for lack of state criminal jurisdiction and moved, alternatively, to submit the issue of his Indian status to the jury for a special verdict on subject-matter jurisdiction. By another order entered
 
 nunc pro tunc
 
 on 24 March, the trial court denied both motions, reaffirming its prior ruling that criminal jurisdiction properly lie in North Carolina, and concluding that a special instruction to the jury on defendant's Indian status as it implicated North Carolina's subject-matter jurisdiction was unwarranted.
 

 From 28 March until 15 April 2016, defendant was tried in Jackson County Superior Court, yielding jury convictions of armed robbery, first-degree felony murder, and firearm possession by a felon. The trial court arrested judgment on the armed-robbery conviction; entered a
 
 *294
 
 judgment on the murder conviction, sentencing defendant to life imprisonment without parole; and entered another judgment on the firearm-possession-by-a-felon conviction, sentencing defendant to an additional fourteen to twenty-six months in prison. Defendant appeals.
 

 II. Arguments
 

 On appeal, defendant asserts the trial court erred by (1) denying his motions to dismiss the state-law charges for lack of subject-matter jurisdiction because North Carolina was preempted from prosecuting him under the IMCA; (2) denying his request to submit the issue of his Indian status to the jury for a special verdict on subject-matter jurisdiction because he presented sufficient evidence at the jurisdictional hearing from which a jury could find that he is an Indian, and he thus raised a factual issue as to jurisdiction; and (3) denying his motion to suppress the incriminating statements he made to police during his custodial interview because he invoked his right to counsel. Defendant also asserts (4) the case must be remanded to correct a clerical error.
 

 III. Denial of Motion to Dismiss
 

 Defendant first asserts the State of North Carolina lacked criminal jurisdiction to prosecute him because he is an "Indian" and thus the IMCA applied to preempt state criminal jurisdiction.
 
 See
 

 18 U.S.C. § 1153
 
 (providing for exclusive federal jurisdiction when an "Indian" commits certain enumerated "major crimes" in "Indian Country"). The State asserts North Carolina enjoys concurrent criminal jurisdiction over all crimes committed in the Qualla Boundary, regardless of whether a
 
 *135
 
 defendant is an Indian. Alternatively, the State argues that even if the IMCA would preempt North Carolina from exercising criminal jurisdiction over these major crimes if they occurred in the Qualla Boundary, it is inapplicable here because defendant is not an "Indian."
 

 A. Review Standard
 

 "Whether a trial court has subject-matter jurisdiction is a question of law, reviewed
 
 de novo
 
 on appeal."
 
 State v. Herman
 
 ,
 
 221 N.C. App. 204
 
 , 209,
 
 726 S.E.2d 863
 
 , 866 (2012) (citing
 
 State v. Abbott
 
 ,
 
 217 N.C. App. 614
 
 , 616,
 
 720 S.E.2d 437
 
 , 439 (2011) ).
 

 B. IMCA Preempts State Criminal Jurisdiction
 

 The State first argues that Fourth Circuit and North Carolina precedent establishes that "North Carolina at least has concurrent criminal jurisdiction over the Qualla Boundary without regard to whether the defendant is an Indian or non-Indian." Among other distinguishing
 
 *295
 
 reasons, those cases
 
 [2]
 
 are not controlling because they were decided before
 
 United States v. John
 
 ,
 
 437 U.S. 634
 
 ,
 
 98 S.Ct. 2541
 
 ,
 
 57 L.Ed.2d 489
 
 (1978) (holding that the State of Mississippi lacked criminal jurisdiction over a Choctaw Indian for a major crime committed on the Choctaw Reservation pursuant to the IMCA, regardless of Choctaw Indians' dual status as citizens of Mississippi and members of a federally recognized Indian tribe).
 
 Cf.
 

 Eastern Band of Cherokee Indians v. Lynch
 
 ,
 
 632 F.2d 373
 
 , 380 (4th Cir. 1980) (relying on
 
 John
 
 's rationale to hold that, although EBCI Indians enjoy dual status as "citizens of North Carolina and Indians living on a federally held reservation," North Carolina lacked authority to impose an income tax on EBCI tribal members who derived their income from activities on the reservation).
 

 "[T]he exercise of state-court jurisdiction ... is preempted by federal law. ... upon a showing of congressional intent to 'occupy the field' and prohibit parallel state action."
 
 Jackson Cty. v. Swayney
 
 ,
 
 319 N.C. 52
 
 , 56,
 
 352 S.E.2d 413
 
 , 415-16 (1987) (citations omitted). The IMCA provides in pertinent part:
 

 (a) Any
 
 Indian
 
 who commits against ... [any] other person ... murder, ... [or] robbery[ ] ... within ... Indian country,
 
 shall be subject to
 
 the same law and penalties as all other persons committing any of the above offenses, within
 
 the exclusive jurisdiction of the United States
 
 .
 

 18 U.S.C. § 1153
 
 (a) (emphasis added). This language demonstrates clear Congressional intent for "exclusive" federal criminal jurisdiction ousting parallel state action when the IMCA applies.
 
 See
 

 Negonsott v. Samuels
 
 ,
 
 507 U.S. 99
 
 , 102-03,
 
 113 S.Ct. 1119
 
 , 1121-22,
 
 122 L.Ed.2d 457
 
 (1993) ("As the text of § 1153 [ ] ... and our prior cases make clear, federal jurisdiction over the offenses covered by the [IMCA] is 'exclusive' of state jurisdiction." (citations omitted) );
 
 see also
 

 John
 
 ,
 
 437 U.S. at 651
 
 ,
 
 98 S.Ct. at 2550
 
 (affirming that " § 1153 ordinarily is pre-emptive of state jurisdiction when it applies").
 

 Accordingly, when an "Indian" commits one of the enumerated "major crimes" in the "Indian Country" of the Qualla Boundary, the IMCA would ordinarily oust North Carolina's criminal jurisdiction. Murder and armed robbery are "major crimes" under the IMCA, and the offenses here were committed in undisputed "Indian Country."
 
 See
 

 Lynch
 
 ,
 
 632 F.2d at 380
 
 . At issue is whether defendant qualifies as an "Indian," such
 
 *296
 
 that the IMCA applied to preempt North Carolina from exercising its state criminal jurisdiction.
 

 C. The
 
 Rogers
 
 Test
 

 Defendant claims Indian status with the EBCI. Both parties concede the issue of whether someone qualifies as an Indian under the IMCA is an issue of first impression for both the Fourth Circuit and our state appellate courts. While the ICMA does not explicate who qualifies as an "Indian" for federal criminal jurisdiction purposes, to answer this question federal circuit courts of appeal employ a two-pronged test suggested by
 
 *136
 

 United States v. Rogers
 
 ,
 
 45 U.S. 567
 
 , 573,
 
 4 How. 567
 
 ,
 
 11 L.Ed. 1105
 
 (1846). To satisfy the first prong, a defendant must have some Indian blood; to satisfy the second, a defendant must be recognized as an Indian by a tribe and/or the federal government.
 
 See, e.g.
 
 ,
 
 United States v. Zepeda
 
 ,
 
 792 F.3d 1103
 
 , 1106-07 (9th Cir. 2015) (en banc) (interpreting
 
 Rogers
 
 as requiring the "government [to] prove that the defendant (1) has some quantum of Indian blood and (2) is a member of, or is affiliated with, the federally recognized tribe");
 
 United States v. Stymiest
 
 ,
 
 581 F.3d 759
 
 , 762 (8th Cir. 2009) ("The [IMCA] does not define Indian, but the generally accepted test-adapted from ...
 
 Rogers
 
 [ ] ... -asks whether the defendant (1) has some Indian blood, and (2) is recognized as an Indian by a tribe or the federal government or both."). Here, the trial court found, and neither party disputes, that
 
 Rogers
 
 ' first prong was satisfied because defendant has an Indian blood quantum of 11/256 or 4.29%. At issue is
 
 Rogers
 
 ' second prong.
 

 While the Fourth Circuit has not addressed how to apply
 
 Rogers
 
 to determine whether someone qualifies as an Indian, there is a federal circuit split in assessing
 
 Rogers
 
 ' second prong. The Ninth Circuit considers only the following four factors and "in declining order of importance":
 

 (1) enrollment in a federally recognized tribe; (2) government recognition formally and informally through receipt of assistance available only to individuals who are members, or are eligible to become members, of federally recognized tribes; (3) enjoyment of the benefits of affiliation with a federally recognized tribe; (4) social recognition as someone affiliated with a federally recognized tribe through residence on a reservation and participation in the social life of a federally recognized tribe.
 

 Zepeda
 
 ,
 
 792 F.3d at 1114
 
 . The Eighth Circuit also considers these factors but assigns them no order of importance, other than tribal enrollment which it deems dispositive of Indian status, and allows for the
 
 *297
 
 consideration of other factors, such as whether a defendant has been subjected to tribal court jurisdiction and whether a defendant has held himself out as an Indian.
 
 See
 

 Stymiest
 
 ,
 
 581 F.3d at 763-66
 
 .
 

 Here, the trial court applied the Ninth Circuit's test and determined defendant was not an Indian for criminal jurisdiction purposes. Because defendant would not qualify as an Indian under either test, we find no error in the trial court's denial of his motion to dismiss.
 
 Cf.
 

 State v. Austin
 
 ,
 
 320 N.C. 276
 
 , 290,
 
 357 S.E.2d 641
 
 , 650 (1987) ("A correct decision of a lower court will not be disturbed on review simply because an insufficient or superfluous reason is assigned. The question for review is whether the ruling of the trial court was correct and not whether the reason given therefor is sound or tenable." (citing
 
 State v. Blackwell
 
 ,
 
 246 N.C. 642
 
 , 644,
 
 99 S.E.2d 867
 
 , 869 (1957) ).)
 

 D.
 
 Rogers
 
 ' Second Prong
 

 Rogers
 
 ' second prong "asks whether the defendant ... is recognized as an Indian by a tribe or the federal government or both."
 
 Stymiest
 
 ,
 
 581 F.3d at 762
 
 . Defendant first argues he satisfied this prong as a matter of law because he presented evidence that he is a first descendant of an enrolled member of the EBCI, and the EBCI recognizes all first descendants as Indians for purposes of exercising tribal criminal jurisdiction.
 

 Defendant relies on the Cherokee Court of the EBCI's decision in
 
 Eastern Band of Cherokee Indians v. Lambert
 
 , No. CR 03-0313,
 
 2003 WL 25902446
 
 , at *2-3 (EBCI Tribal Ct. May 29, 2003) (holding that the EBCI had tribal criminal jurisdiction over a non-enrolled first descendant), and its subsequent decisions interpreting
 
 Lambert
 
 as "[h]olding that First Lineal Descendants are Indians for the purposes of the exercise of this Court's [tribal criminal] jurisdiction,"
 
 Eastern Band of Cherokee Indians v. Prater
 
 , No. CR 03-1616,
 
 2004 WL 5807679
 
 , at *1 (EBCI Tribal Ct. Mar. 18, 2004) ;
 
 see also
 

 In re Welch
 
 , No. SC 03-13,
 
 2003 WL 25902440
 
 , *4 (Eastern Cherokee Ct. Oct. 31, 2003) (interpreting
 
 Lambert
 
 as holding that "first lineal descendants, children of enrolled members who do not possess sufficient blood quanta to qualify for enrollment themselves[,] are nevertheless subject to the criminal jurisdiction of the Court"). Additionally, defendant relies on Rule 6 of the Cherokee Rules of Criminal Procedure that instructs
 
 *137
 
 tribal magistrates when determining jurisdiction that tribal criminal jurisdiction exists if a suspect is a first descendant.
 
 See
 
 Cherokee Code § 15-8, Rule 6(b).
 

 The State argues in relevant part that even if the EBCI recognizes all first descendants as Indians for purposes of exercising its tribal criminal jurisdiction, this is only one factor to consider when assessing
 
 Rogers
 
 ' second prong. We agree.
 

 *298
 
 While exercising tribal criminal jurisdiction over first descendants reflects a degree of tribal recognition, the Ninth Circuit has determined that "enrollment, and, indeed, even eligibility therefor, is not dispositive of Indian status."
 
 Bruce
 
 ,
 
 394 F.3d at 1225
 
 . As tribal enrollment has been declared insufficient to satisfy
 
 Rogers
 
 ' second prong as a matter of law, it follows that the exercise of criminal tribal jurisdiction over first descendants is also insufficient.
 
 Cf.
 

 United States v. Cruz
 
 ,
 
 554 F.3d 840
 
 , 851 (9th Cir. 2009) ("[A] showing that a tribal court on one occasion may have exercised jurisdiction over a defendant is of little if any consequence in satisfying the [Indian] status element [beyond a reasonable doubt] in a § 1153 prosecution."). As the Ninth Circuit's application of the
 
 Rogers
 
 test contemplates a balancing of multiple factors to determine Indian status, we reject defendant's argument that the EBCI's decision to exercise its criminal tribal jurisdiction over first descendants satisfies
 
 Rogers
 
 ' second prong as a matter of law.
 

 E.
 
 St. Cloud
 
 Factors
 

 Alternatively, defendant argues, he satisfied
 
 Rogers
 
 ' second prong under the Ninth Circuit's test as applied by the trial court. In
 
 St. Cloud v. United States
 
 ,
 
 702 F.Supp. 1456
 
 , 1461 (D.S.D. 1988), the Central Division of the United States District Court of South Dakota set forth four factors to be considered in declining order of importance when evaluating
 
 Rogers
 
 ' second prong. The Ninth Circuit adopted these "
 
 St. Cloud
 
 " factors,
 
 see
 

 Bruce
 
 ,
 
 394 F.3d at 1223
 
 , and its later
 
 en banc
 
 articulation of its test instructs that "the criteria are, in declining order of importance":
 

 (1) enrollment in a federally recognized tribe; (2) government recognition formally and informally through receipt of assistance available only to individuals who are members, or are eligible to become members, of federally recognized tribes; (3) enjoyment of the benefits of affiliation with a federally recognized tribe; (4) social recognition as someone affiliated with a federally recognized tribe through residence on a reservation and participation in the social life of a federally recognized tribe.
 

 Zepeda
 
 ,
 
 792 F.3d at 1114
 
 .
 

 1. First
 
 St. Cloud
 
 Factor
 

 The first and most important
 
 St. Cloud
 
 factor asks whether a defendant is an enrolled member of a federally recognized tribe.
 

 Id.
 

 Here, the trial court found, and defendant concedes, he is not an enrolled tribal
 
 *299
 
 member of the EBCI or any federally recognized tribe, nor is he eligible to become an enrolled member of the EBCI, as his 4.29% Indian blood quantum fails to satisfy the minimum 16% necessary for enrollment.
 

 Nonetheless, defendant argues, this factor weighs in his favor because "he has been afforded a special status as a First Descendant." The Ninth Circuit has stated that while descendant status "does not carry similar weight to enrollment, and should not be considered determinative, it reflects some degree of recognition."
 
 United States v. Maggi
 
 ,
 
 598 F.3d 1073
 
 , 1082 (9th Cir. 2010),
 
 overruled on other grounds by
 

 United States v. Zepeda
 
 ,
 
 792 F.3d 1103
 
 (9th Cir. 2015). However, we find defendant's first descendant status carries little weight in this case.
 

 First descendants are eligible for certain tribal benefits unavailable to non-members or members of other tribes. While the evidence showed that defendant would qualify for designation as a first descendant, it also showed that he is not classified by the EBCI as a first descendant, and he is thus currently ineligible to receive those benefits. The trial court's unchallenged findings established that individuals designated as first descendants are issued a "Letter of Descent" by the EBCI tribal enrollment office, which is used to establish eligibility for first descendant benefits, and that no "Letter of Descent" for defendant was found after a search of the
 
 *138
 
 official documents in the tribal enrollment office.
 
 Cf.
 

 Cruz
 
 ,
 
 554 F.3d at 847
 
 (concluding that "mere eligibility for benefits is of no consequence under [the
 
 St. Cloud
 
 factors]" and rejecting "the dissent's argument that mere descendant status with the concomitant eligibility to receive benefits is effectively sufficient to demonstrate 'tribal recognition' "). Accordingly, the trial court properly determined the evidence presented failed to satisfy the first
 
 St. Cloud
 
 factor.
 

 2. Second
 
 St. Cloud
 
 Factor
 

 The second
 
 St. Cloud
 
 factor asks whether a defendant has been recognized by the government "through receipt of assistance available only to individuals who are members, or are eligible to become members, of federally recognized tribes."
 
 Zepeda
 
 ,
 
 792 F.3d at 1114
 
 . Defendant argues this factor was satisfied because he received health care services reserved only for Indians. The record evidence indicated that defendant received free health care services on five occasions-31 October 1985, 1 October 1987, 12 March 1989, 16 March 1989, and 28 February 1990-from the Cherokee Indian Hospital ("CIH"), which at the time was a federally funded Indian Health Service ("IHS").
 

 Applying this evidence to the second
 
 St. Cloud
 
 factor, the trial court found:
 

 *300
 
 264. ... [U]nder the second
 
 St. Cloud
 
 factor the only evidence of government recognition of the Defendant as an Indian is the receipt of medical services at the CIH. The Federal government through the Indian Health Service provide[s] benefits reserved only to Indians arising from the unique trust relationship with the tribes. Also, the government of the Eastern Band of Cherokee provides additional health benefits to the enrolled members. The only evidence Defendant presents of the receipt of health services available only to Indians is medical care at the CIH more than two decades ago as documented in his medical chart. While it is true that he did receive care from the CIH it is likewise true he sought acute care, this care was when he was a minor and he was taken for treatment by his mother. Since becoming an adult he has never sought further medical care from the providers in Cherokee. Moreover, the last time he sought care from the CIH was over 23 years ago.
 

 ....
 

 266. [E]xcept for the five visits to the CIH, there is no other evidence Defendant received any services or assistance reserved only to individuals recognized as Indian under the second
 
 St. Cloud
 
 factor.
 

 Defendant relies on
 
 United States v. LaBuff
 
 ,
 
 658 F.3d 873
 
 (9th Cir. 2011), to argue that receipt of free health care services from an IHS satisfies the second
 
 St. Cloud
 
 factor.
 
 LaBuff
 
 is distinguishable because the defendant there, "since 1979, ... was seen at the Blackfeet Community Hospital for Well Child care services, walk-in visits, urgent care, and mental health assistance[,]" and "since 2009, [he] sought medical care approximately 10 to 15 times."
 

 Id.
 

 at 879 n.8. Here, defendant only sought medical care from the CIH five times when he was a minor, his last visit occurring approximately twenty-two years before he was arrested on the charges at issue in this case.
 
 Cf.
 

 Zepeda
 
 ,
 
 792 F.3d at 1113
 
 ("In a prosecution under the IMCA, the government must prove that the defendant was an Indian
 
 at the time of the offense
 
 with which the defendant is charged." (emphasis added) ). The trial court properly determined this evidence failed to sufficiently satisfy the second
 
 St. Cloud
 
 factor.
 

 3. Third
 
 St. Cloud
 
 Factor
 

 The third
 
 St. Cloud
 
 factor asks whether a defendant has "enjoy[ed] ... the benefits of affiliation with a federally recognized tribe."
 

 *301
 

 Zepeda
 
 ,
 
 792 F.3d at 1114
 
 . Defendant argues he satisfied this factor based on the same five CIH visits when he was a minor.
 

 As to this third factor, the trial court found:
 

 267. ... [U]nder the third
 
 St. Cloud
 
 factor the Court must examine how Defendant has benefited from his affiliation with the Eastern Band of Cherokee. The Defendant suggests he has satisfied the third factor under the
 
 St. Cloud
 
 test in that Cherokee law affords special benefits to First Descendants. To be sure the Cherokee Code
 
 *139
 
 as developed over time since the ratification of the 1986 Charter and Governing Document does afford special benefits and opportunities to First Descendants.
 
 Whilst it is accurate the Cherokee Code is replete with special provisions for First Descendants in areas of real property, education, health care, inheritance, employment and access to the Tribal Court, save however for use of medical services a quarter of a century ago Defendant has not demonstrated use of any of his rights as a First Descendant of the Eastern Band of Cherokee.
 

 268. ... [T]he third
 
 St. Cloud
 
 factor is 'enjoyment' of the benefits of tribal affiliation.
 
 Enjoyment connotes active and affirmative use. Such is not the case with Defendant. Defendant directs the undersigned to no positive, active and confirmatory use of the special benefits afforded to First Descendants.
 
 Defendant has never 'enjoyed' these opportunities which were made available for individuals similarly situated who enjoy close family ties to the Cherokee tribe. Rather, Defendant merely presents the Cherokee Code and asks the undersigned to substitute opportunity for action. To ascribe enjoyment of benefits where none occurred would be tantamount to finding facts where none exist.
 

 (Emphasis added.)
 

 In his brief, defendant challenges the following factual finding on this factor:
 

 275. ... [A]ccordingly after balancing all the evidence presented to the undersigned using the
 
 Rogers
 
 test and applying the
 
 St. Cloud
 
 factors in declining order of importance, ... while Defendant does have, barely, a small degree of
 
 *302
 
 Indian blood he is not an enrolled member of the Eastern Cherokee, never benefited from his special status as a First Descendant and is not recognized as an Indian by the Eastern Band of Cherokee Indians, any other federally recognized Indian tribe or the federal government. Therefore, the Defendant for purposes of this motion to dismiss is not an Indian.
 

 Specifically, defendant challenges as unsupported by the evidence the part of this finding that he "never benefited from his special status as a First Descendant and is not recognized as an Indian by the EBCI ... or the federal government" because he was recognized by the federal government when he was benefited from his first descendant status by receiving federally-funded services from an IHS. To the degree defendant may have benefited from his first descendant status and was recognized by the federal government by receiving free medical care from the CIH on those five instances last occurring when he was a minor twenty-three years before the hearing, we conclude it is irrelevant in assessing this factor in light of the absence of evidence that defendant enjoyed any other tribal benefits he may have been eligible to receive based on his first descendant status. Accordingly, the trial court properly determined this evidence failed to satisfactorily satisfy the third
 
 St. Cloud
 
 factor.
 

 4. Fourth
 
 St. Cloud
 
 Factor
 

 The fourth and least important
 
 St. Cloud
 
 factor asks whether a defendant is "social[ly] recogni[zed] as someone affiliated with a federally recognized tribe through residence on a reservation and participation in the social life of a federally recognized tribe."
 
 Zepeda
 
 ,
 
 792 F.3d at 1114
 
 . Defendant asserts he satisfied this factor because he "lived on or near the Qualla Boundary for significant periods of time," attended Cherokee schools as a minor, and, after leaving prison in Florida in 2011, he "returned to living on or near the Qualla Boundary, often with enrolled tribal members," "got a job on the reservation, and lived on the reservation with Carothers, a member of another tribe." Defendant also argues his two tattoos-an eagle and a Native American wearing a headdress-"show an attempt to hold himself out as an Indian."
 

 As to this factor, the trial court issued,
 
 inter alia
 
 , the following finding:
 

 271. ... [T]he Defendant simply has no ties to the Qualla Boundary. ... [U]nder the fourth
 
 St. Cloud
 
 factor Defendant points to no substantive involvement in the fabric of the Cherokee Indian community at any time. The Defendant
 
 *303
 
 did reside and work on or near the Cherokee reservation for about 14 months when his probation
 
 *140
 
 was transferred from Florida to North Carolina. Yet in these 14 months near Cherokee the record is devoid of any social involvement in the Cherokee community by the Defendant.
 

 While the record evidence showed defendant returned to the Qualla Boundary in 2011 for about fourteen months, resided on or near the Qualla Boundary with an enrolled member of another tribe, and worked for a restaurant, Homestyle Fried Chicken, located within the Qualla Boundary, no evidence showed he participated in EBCI cultural or social events, or in any EBCI religious ceremonies during that time.
 

 Myrtle Driver Johnson, a sixty-nine-year old enrolled EBCI member who has lived on the Qualla Boundary her entire life and was bestowed the honor of "Beloved Woman" by tribal leaders for her dedication and service to the EBCI, testified about EBCI social and cultural life, and EBCI religious ceremonies. The trial court's unchallenged findings establish that Johnson is "richly versed in the history of the Eastern Cherokee" and "deeply involved in and a leader of the Cherokee community regarding the language, culture and tradition of the [EBCI]." Johnson testified she participated in various EBCI social and cultural events and ceremonies on the Qualla Boundary over the years and was unfamiliar with defendant or his enrolled mother. Johnson also testified about the potential EBCI cultural symbolism of defendant's tattoos, opining that "[a]ll Native American Tribes honor the eagle" and it thus represented nothing unique to the EBCI, and that the headdress depicted on defendant's tattoo was worn not by the Cherokee but by "western plains Native Americans." The trial court properly determined this evidence carried little weight under the fourth
 
 St. Cloud
 
 factor.
 

 F. Sufficiency of Factual Findings
 

 Defendant also challenges the evidentiary sufficiency of ten of the trial court's 278 factual findings, and eight subsections of another finding. However, most of those findings either recite the absence of evidence pertaining to defendant's tribal affiliation with the EBCI as to assessing his Indian status under
 
 Rogers
 
 , or were based on probation documents indicating defendant's race was "white/Caucasian," which were presented after the jurisdictional hearing. Erroneous or irrelevant findings that do not affect the trial court's conclusions are not grounds for reversal.
 
 See, e.g.
 
 ,
 
 State v. Hernandez
 
 ,
 
 170 N.C. App. 299
 
 , 305,
 
 612 S.E.2d 420
 
 , 424 (2005) ("[A]n order 'will not be disturbed because of ... erroneous findings which do not affect the conclusions.' " (citation
 
 *304
 
 omitted) );
 
 Goodson v. Goodson
 
 ,
 
 145 N.C. App. 356
 
 , 360,
 
 551 S.E.2d 200
 
 , 204 (2001) ("[I]rrelevant findings in a trial court's decision do not warrant a reversal of the trial court." (citations omitted) ). Because we conclude the trial court's other factual findings adequately supported its conclusions, we decline to address the sufficiency of those findings.
 

 G. Conclusion
 

 Because the evidence presented did not demonstrate that defendant is an "Indian" or that he sufficiently satisfied any of the
 
 St. Cloud
 
 factors, the trial court properly concluded defendant did not qualify as an Indian for criminal jurisdiction purposes when applying the Ninth Circuit's test. Accordingly, the trial court properly denied defendant's motion to dismiss the charges for lack of jurisdiction.
 

 III. Denial of Motion for Special Jury Verdict
 

 Defendant next asserts the superior court erred by denying his pretrial motion to submit the issue of his Indian status to the jury for a special verdict on subject-matter jurisdiction.
 

 "[W]hen jurisdiction is challenged[ ] ... the State must carry the burden [of proof] and show beyond a reasonable doubt that North Carolina has jurisdiction to try the accused."
 
 State v. Batdorf
 
 ,
 
 293 N.C. 486
 
 , 494,
 
 238 S.E.2d 497
 
 , 502-03 (1977). In the territorial jurisdiction context, our Supreme Court has explained:
 

 When jurisdiction is challenged, the defendant is contesting the very power of this State to try him. We are of the view that a question as basic as jurisdiction is not an 'independent, distinct, substantive matter
 
 *141
 
 of exemption, immunity or defense' and ought not to be regarded as an affirmative defense on which the defendant must bear the burden of proof. Rather, jurisdiction is a matter which,
 
 when contested
 
 , should be proven by the prosecution as a prerequisite to the authority of the court to enter judgment.
 

 Id.
 
 at 493,
 
 238 S.E.2d at 502
 
 (internal citation omitted);
 
 see also
 

 State v. Rick
 
 ,
 
 342 N.C. 91
 
 , 100-01,
 
 463 S.E.2d 182
 
 , 186 (1995) ("[T]he State, when jurisdiction is challenged, [is required] to prove beyond a reasonable doubt that the crime with which defendant is charged occurred in North Carolina." (citing
 
 Batdorf
 
 ,
 
 293 N.C. at 494
 
 ,
 
 238 S.E.2d at
 
 502-03 ); other citation omitted). However, unless sufficient evidence is adduced to create a jury question on jurisdiction, "a jury instruction regarding jurisdiction is not warranted."
 

 *305
 

 State v. White
 
 ,
 
 134 N.C. App. 338
 
 , 340,
 
 517 S.E.2d 664
 
 , 666 (1999) (citation omitted). The "preliminary determination that sufficient evidence exists" to create a jury question on the factual basis of jurisdiction is a question of law for the court.
 
 Rick
 
 ,
 
 342 N.C. at 100-01
 
 ,
 
 463 S.E.2d at 187
 
 (citations omitted).
 

 Here, defendant filed a pretrial motion to dismiss the charges against him for lack of state criminal jurisdiction. But his motion was grounded not in a challenge to North Carolina's territorial jurisdiction, but in a challenge to its subject-matter jurisdiction, based on his claim that he was an Indian. After the pretrial jurisdictional hearing, the trial court entered an order denying defendant's motion on the basis that defendant was not an Indian for criminal jurisdiction purposes and the State therefore satisfied its burden of proving jurisdiction beyond a reasonable doubt. Upon defendant's renewed jurisdictional motion to dismiss or, in the alternative, to submit the issue of his Indian status to the jury for a special verdict on subject-matter jurisdiction, the trial court entered another order denying both motions.
 

 In this second order, the trial court reaffirmed its prior ruling that North Carolina had criminal jurisdiction and thus denied the renewed jurisdictional motion to dismiss on that basis. As to defendant's alternative motion for a special jurisdictional instruction to the jury, the trial court concluded that because the crimes undisputedly occurred within North Carolina, and the only special instruction on jurisdiction concerned territorial jurisdiction, such an instruction was unwarranted. As to defendant's specific request that his Indian status be submitted to the jury, the trial court concluded that because it "already determined the Defendant is not an Indian for purposes of criminal jurisdiction" and "there exists no requirement that in order to convict the Defendant in the North Carolina state court of murder the State must prove beyond a reasonable doubt that the defendant is an Indian," submitting that issue to the jury was unwarranted. We conclude the trial court did not err in denying defendant's motion for a special instruction on the issue of his Indian status as it related to state criminal jurisdiction.
 

 Defendant's cited authority concerns factual matters implicating territorial jurisdiction, not subject-matter jurisdiction. Unlike IMCA prosecutions, under which Indian status is a jurisdictional prerequisite that the Government must prove beyond a reasonable doubt,
 
 see
 

 Zepeda
 
 ,
 
 792 F.3d at 1110
 
 ("Under the IMCA, 'the defendant's Indian status is an essential element ... which the government must allege in the indictment and prove beyond a reasonable doubt.' " (quoting
 
 Bruce
 
 ,
 
 394 F.3d at
 
 1229 ) ), neither have our General Statutes nor our state appellate court decisions burdened the State when prosecuting major state-law crimes
 
 *306
 
 that occurred in Indian Country to prove a defendant is
 
 not
 
 an Indian beyond a reasonable doubt. But even if the State had such a burden, in this particular case, we conclude defendant failed to adduce sufficient evidence to create a jury question on his Indian status.
 

 The record evidence established that defendant failed to satisfy the first and most important
 
 St. Cloud
 
 factor of tribal enrollment, or even eligibility for tribal enrollment. While defendant presented evidence that on five instances during his childhood he received free health care based on his first descendant status, he presented no evidence he received or enjoyed any other tribal benefits based on that status. Indeed, the evidence showed that while defendant would
 
 *142
 
 qualify to be designated by the EBCI as a first descendant for purposes of receiving such benefits, he was not currently recognized by the EBCI as a first descendant based on his failure to apply for and obtain a "Letter of Descent." While defendant returned to living on or near the Qualla Boundary in 2011 for fourteen months, he presented no evidence that during that time he was involved in any EBCI cultural or social activities or events or activities, or any EBCI religious ceremonies. Finally, while defendant is tattooed with an eagle and a Native American wearing a headdress, the State presented evidence that the EBCI affords no unique significance to the eagle, and that headdress was never worn during any EBCI ritual or tradition but was worn by western plain Native Americans.
 

 Based on defendant's showing at the jurisdictional hearing, we conclude he failed to adduce sufficient evidence to create a jury question as to whether he qualifies as an Indian for criminal jurisdiction purposes. Accordingly, the trial court properly denied defendant's motion to submit the issue of his Indian status to the jury for a special verdict on subject-matter jurisdiction.
 

 IV. Denial of Motion to Suppress
 

 Defendant contends the trial court erred by denying his motion to suppress incriminating statements he made to police during a custodial interview after allegedly invoking his constitutional right to counsel.
 

 Our review of a trial court's denial of a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law."
 
 State v. Cooke
 
 ,
 
 306 N.C. 132
 
 , 134,
 
 291 S.E.2d 618
 
 , 619 (1982) (citations omitted). Conclusions of law are reviewed
 
 de novo
 
 .
 
 State v. McCollum
 
 ,
 
 334 N.C. 208
 
 , 237,
 
 433 S.E.2d 144
 
 , 160 (1993) (citation omitted).
 

 *307
 
 The objective standard used to determine whether a custodial suspect has unambiguously invoked his right to counsel is whether "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."
 
 Davis v. United States
 
 ,
 
 512 U.S. 452
 
 , 459,
 
 114 S.Ct. 2350
 
 , 2355,
 
 129 L.Ed.2d 362
 
 (1994). "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect
 
 might
 
 be invoking the right to counsel, our precedents do not require the cessation of questioning."
 

 Id.
 

 (citing
 
 McNeil v. Wisconsin
 
 ,
 
 501 U.S. 171
 
 , 178,
 
 111 S.Ct. 2204
 
 , 2209,
 
 115 L.Ed.2d 158
 
 (1991) ). For instance, "if a suspect is 'indecisive in his request for counsel,' the officers need not always cease questioning."
 
 Id.
 
 at 460,
 
 114 S.Ct. at 2356
 
 (quoting
 
 Miranda v. Arizona
 
 ,
 
 384 U.S. 436
 
 , 485,
 
 86 S.Ct. 1602
 
 , 1633,
 
 16 L.Ed.2d 694
 
 (1966) ).
 

 Further, even if a suspect unambiguously invokes his right to counsel during a custodial interview, "he is not subject to further questioning until a lawyer has been made available
 
 or the suspect himself reinitiates conversation
 
 ."
 

 Id.
 

 at 458
 
 ,
 
 114 S.Ct. at 2354-55
 
 (emphasis added) (citing
 
 Edwards v. Arizona
 
 ,
 
 451 U.S. 477
 
 , 484-85,
 
 101 S.Ct. 1880
 
 , 1884-85,
 
 68 L.Ed.2d 378
 
 (1981) );
 
 see also
 

 Edwards
 
 ,
 
 451 U.S. at 484-85
 
 ,
 
 101 S.Ct. at 1885
 
 ("[A]n accused ... [after invoking his right to counsel], is not subject to further interrogation by the authorities until counsel has been made available to him,
 
 unless the accused himself initiates further communication, exchanges, or conversations with the police
 
 ." (emphasis added) ).
 

 Here, the trial court found, unchallenged on appeal, that before his custodial interview, defendant "was advised and read his
 
 Miranda
 
 ... rights," that he "initialed and signed the
 
 Miranda
 
 rights form," that he "understood his
 
 Miranda
 
 rights and at no time subsequent to the commencement of the interview indicated he failed to understand his
 
 Miranda
 
 rights," and that he "then waived his
 
 Miranda
 
 rights and spoke with law enforcement." The trial court also issued the following unchallenged and thus binding findings:
 

 80. In this case Defendant said "Can I consult with a lawyer, I mean, or anything? I mean, I-I-I did it. I'm not laughing,
 
 *143
 
 man, I want to cry because it's f[*]cked up to be put on the spot like this."
 

 81. Applying an objective standard in analyzing the statement of Defendant, the undersigned finds there never was an assertion of a right but rather simply a question. Further, Defendant did not stop talking after asking the
 
 *308
 
 question to allow law enforcement to respond. Defendant did not cease talking or refuse to answer more questions but rather continued talking to investigators for the entirety of the interview. The undersigned determines that no assertion of a right to counsel was made by Defendant.
 

 ....
 

 83. This ambiguous statement by Defendant fails to support a finding that
 
 Miranda
 
 rights were asserted.
 

 84. Furthermore, the undersigned has also examined the claimed request for counsel by Defendant in the context of the questions posed and answers given both before and after page 58. Again, with the expanded examination of the statement made by Defendant and considering the context of that section of the interview, Defendant also fails to objectively establish he unequivocally and unambiguously invoked his
 
 Miranda
 
 rights to counsel.
 

 85. Reviewing the entire transcript, the Defendant asked about the attorney as a question on page 58. Law enforcement clearly and appropriately answered the question posed. Most telling, Det. Iadonisi in response told Defendant he had a right to have an attorney followed immediately by SBI Agent Oaks further clarifying and explaining that law enforcement can never make the decision to invoke
 
 Miranda
 
 rights for a defendant. After answering Defendant's question, explaining he did have and continued to possess
 
 Miranda
 
 rights and that no person except Defendant could elect to assert and invoke
 
 Miranda
 
 rights, the Defendant continued to talk to law enforcement.
 

 86. With further import, it is essential to note that for the entire remainder of the interview the Defendant never again mentioned an attorney or told law enforcement he wished to stop talking.
 

 Our review of the video recording of defendant's interrogation comports with the trial court's findings and its ultimate conclusion that defendant's statements were not obtained in violation of his constitutional rights. Merely one-tenth of a second elapsed between the time that defendant asked, "[c]an I consult with a lawyer, I mean, or anything?" and then stated, "I mean I-I-I did it. I'm not laughing man, I
 
 *309
 
 want to cry because its f[*]cked up to be put on the spot like this." The officers then immediately reminded defendant of his
 
 Miranda
 
 rights, that they had just read him those rights, that defendant "ha[d] the right to have [his attorney] here," and that the officers "[could] never make that choice for [him] one way or another." After police attempted to clarify whether defendant's question was an affirmative assertion of his
 
 Miranda
 
 rights, defendant declined to unambiguously assert that right, continued communications, and never again asked about counsel for the rest of the interview.
 

 Although defendant explicitly asked if he could consult with a lawyer, considering the totality of the circumstances, we agree that defendant's invocation of his
 
 Miranda
 
 rights was ambiguous or equivocal, such that the officers were not required to cease questioning. Defendant did not pause between the time he asked for counsel and gave his initial confession, the officers immediately reminded defendant of his
 
 Miranda
 
 rights to clarify if he was indeed asserting his right to counsel, and defendant declined the offered opportunity to unambiguously assert that right but instead continued communicating with the officers. Even if defendant's question could be objectively construed as an unambiguous invocation of his
 
 Miranda
 
 rights, it was immediately waived when he initiated further communication. Accordingly, the trial court properly denied defendant's motion to suppress.
 

 V. Motion for Appropriate Relief
 

 After defendant's appeal was docketed, he filed a motion for appropriate relief ("MAR") with this Court.
 
 See
 
 N.C. Gen. Stat. § 15A-1418(a) (2017) (authorizing the filing of MARs in the appellate division). Section 15A-1418(b), governing the disposition of MARs
 
 *144
 
 filed in the appellate division, provides in relevant part that "[w]hen a motion for appropriate relief is made in the appellate division, the appellate court must decide whether the motion may be determined on the basis of the materials before it, or whether it is necessary to remand the case to the trial division for taking evidence or conducting other proceedings[.] ..."
 

 Id.
 

 § 15A-1418(b) (2017).
 

 Defendant's MAR is primarily grounded in a claim that his convictions were obtained "in violation of the Constitution of the United States or the Constitution of North Carolina."
 
 See
 
 N.C. Gen. Stat. § 15A-1415(b)(3) (2017). Where, as here, "[t]he materials before [our appellate courts] are not sufficient for us to make that determination," our Supreme Court has instructed that despite section 15A-1418(b)'s "suggest[ion] that the motion be remanded to the trial court for hearing and determination, ...
 

 *310
 
 the better procedure ... is to dismiss the motion and permit defendant, if he so desires, to file a new motion for appropriate relief in the superior court."
 
 State v. Hurst
 
 ,
 
 304 N.C. 709
 
 , 712,
 
 285 S.E.2d 808
 
 , 810 (1982) (per curiam) (footnote omitted). Accordingly, we dismiss defendant's motion without prejudice to his right to refile a new MAR in the superior court.
 

 VI. Clerical Error
 

 Both parties agree the matter must be remanded to the trial court to correct a clerical error in an order. After the jury convicted defendant of first-degree felony murder in 12 CRS 51720, armed robbery in 12 CRS 1363, and firearm possession by a felon in 12 CRS 1362, the trial judge rendered an oral ruling arresting judgment on the armed-robbery conviction. The written order arresting judgment reflects the correct file number of 12 CRS 1363; however, it incorrectly lists the offense as "possess firearm by felon," an offense for which defendant was separately sentenced. We remand the matter to the trial court for the sole purpose of correcting its order arresting judgment on 12 CRS 1363 to accurately reflect the offense of armed robbery.
 

 VII. Conclusion
 

 Because the evidence presented at the jurisdictional hearing failed to satisfactorily satisfy any
 
 St. Cloud
 
 factor, the trial court properly concluded under the Ninth Circuit's test that defendant does not qualify as an Indian for criminal jurisdiction purposes and thus properly denied defendant's motions to dismiss the charges for lack of subject-matter jurisdiction. Because the evidence of defendant's Indian status raised no reasonable factual jury question implicating the State's burden of proving North Carolina's criminal jurisdiction, the trial court properly refused defendant's request to submit the issue of his Indian status to the jury for a special verdict on the matter of subject-matter jurisdiction. Because defendant's incriminating statements were not obtained in violation of his constitutional rights, the trial court properly denied his motion to suppress. Accordingly, we conclude defendant received a fair trial, free of error. Additionally, because the materials before us are insufficient to decide defendant's MAR, we dismiss his motion without prejudice to his right to file a new MAR in the superior court. Finally, we remand this matter to the trial court for the sole purpose of correcting the order arresting judgment on 12 CRS 1363 to accurately reflect the offense of armed robbery.
 

 NO ERROR IN PART; DISMISSED IN PART; REMANDED IN PART.
 

 Judges INMAN and BERGER concur.
 

 [1]
 

 While we use the terms "Native American" and "Indian" interchangeably, we often use "Indian" to comport with the language used in the federal statute at issue in this case.
 

 [2]
 

 United States v. Hornbuckle
 
 ,
 
 422 F.2d 391
 
 (4th Cir. 1970) (per curium);
 
 State v. McAlhaney
 
 ,
 
 220 N.C. 387
 
 ,
 
 17 S.E.2d 352
 
 , 354 (1941) ;
 
 State v. Ta-Cha-Na-Tah
 
 ,
 
 64 N.C. 614
 
 (1870).