IN THE SUPREME COURT OF NORTH CAROLINA

No. 34PA14-2

Filed 28 February 2020

STATE OF NORTH CAROLINA

v.

GEORGE LEE NOBLES

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 818 S.E.2d 129 (N.C. Ct. App. 2018), determining no error in part and remanding in part a judgment entered on 15 April 2016 by Judge Bradley B. Letts in Superior Court, Jackson County. Heard in the Supreme Court on 4 November 2019.

*Joshua H. Stein, Attorney General, by Amy Kunstling Irene, Special Deputy Attorney General, for the State-appellee.*

*Glenn Gerding, Appellate Defender, by Anne M. Gomez, Assistant Appellate Defender, for defendant-appellant.*

DAVIS, Justice.

In this case, we must determine whether defendant has sufficiently demonstrated that he qualifies as an "Indian"[1] under the federal Indian Major Crimes Act (IMCA) such that he was not subject to the jurisdiction of North Carolina's courts. Because we conclude that defendant failed to demonstrate that he is an Indian for

---

[1] Throughout this opinion, we use the term "Indian" to comport with the terminology contained in the Indian Major Crimes Act.

purposes of the IMCA, we affirm the decision of the Court of Appeals.

**Factual and Procedural Background**

On 30 September 2012, Barbara Preidt was robbed at gunpoint and fatally shot outside of a Fairfield Inn in Jackson County. The crime took place within the Qualla Boundary—land that is held in trust by the United States for the Eastern Band of Cherokee Indians (EBCI).

After an investigation by the Cherokee Indian Police Department, defendant, Dwayne Edward Swayney, and Ashlyn Carothers were arrested for the robbery and murder on 30 November 2012. Because Swayney and Carothers were enrolled members of the EBCI and of the Cherokee Nation of Oklahoma, respectively, they were brought before an EBCI tribal magistrate for indictment proceedings. Tribal, state, and federal authorities, however, agreed that defendant should be prosecuted by the State of North Carolina given that he was not present in the EBCI enrollment records. Accordingly, defendant was brought before a Jackson County magistrate and then charged in Jackson County with first-degree murder, robbery with a dangerous weapon, and two counts of possession of a firearm by a felon.

On 15 April 2013, defendant moved to dismiss the charges against him for lack of subject matter jurisdiction, arguing that because he was an Indian he could only be tried in federal court pursuant to the IMCA. The IMCA provides, in pertinent part, that "[a]ny Indian" who commits an enumerated major crime in "Indian country" is subject to "the exclusive jurisdiction of the United States." 18 U.S.C. § 1153(a) (2012).

The trial court held a pre-trial hearing on defendant's motion to dismiss on 9 August 2013. The parties stipulated that defendant was born in 1976 in Florida to Donna Lorraine Smith Crowe, an enrolled member of the EBCI. The parties also stipulated that although defendant himself is not an enrolled member of the EBCI, he "would be [classified as] a first descendant" due to his mother's status.

At the hearing, the trial court received testimony from Kathie McCoy, an employee at the EBCI Office of Tribal Enrollment. McCoy testified that while defendant is neither currently enrolled nor classified as a first descendant in the EBCI database, he was nevertheless "eligible to be designated as a [f]irst [d]escendant" because his mother was an enrolled member of the EBCI.

Annette Tarnawsky, the Attorney General for the EBCI, also provided testimony explaining that while first descendants are not entitled to the full range of tribal affiliation benefits that enrolled members enjoy, first descendants are eligible for some special benefits not available to persons lacking any affiliation with the tribe. These benefits include certain property rights (such as the right to inherit land from enrolled members by valid will and to rent dwellings on tribal land), health care benefits (eligibility to receive free care at the Cherokee Indian Hospital), employment benefits (a limited hiring preference for EBCI employment), and education benefits (access to financial assistance for higher education and adult education services). Tarnawsky also testified that the list of benefits available only to enrolled EBCI members includes the right to hunt and fish on tribal lands, the ability to vote in

tribal elections, and the right to hold tribal office.

The State also presented evidence that defendant had been incarcerated in Florida from 1993 until 2011 and that his pre-sentence report in Florida listed his race and sex as "W/M." When defendant was released from Florida's custody in 2011, he requested that his probation be transferred to North Carolina and listed his race as "white" on his Application for Interstate Compact Transfer.

Defendant's probation officers, Christian Clemmer and Olivia Ammons, testified that in 2011, defendant began living with family members at an address near the Qualla Boundary and working at a fast food restaurant that was also located within the Boundary. For the next fourteen months, defendant lived at various addresses on or near the Qualla Boundary until his arrest on 30 November 2012. Defendant never represented to either of his probation officers that he was an Indian. On a mandatory substance abuse screening form completed by Ammons on 7 May 2012, defendant's race was listed as "white."

Defendant's mother also testified at the hearing, stating that she is an enrolled EBCI member but that defendant's father was white and not affiliated with any tribe. She testified that defendant lived on or near the Qualla Boundary for much of his childhood and that she had enrolled defendant in both the Cherokee tribal school system and the Swain County school system. On one Bureau of Indian Affairs (BIA) student enrollment application, she listed defendant's "Degree Indian" as "none." On two other BIA student enrollment applications, however, she listed defendant's

"Tribal Affiliation" as "Cherokee."

As a child, defendant received treatment at the Swain County Hospital for injuries suffered in a car accident, and the EBCI paid for the portion of his medical expenses not covered by health insurance. An employee of Cherokee Indian Hospital, Vickie Jenkins, testified that defendant received care at the hospital on five occasions between 1985 and 1990. The hospital serves only enrolled members of the EBCI and first descendants, both of whom receive medical services at no cost. Defendant's hospital records indicated that he was of EBCI descent and identified him as an "Indian nontribal member."

After hearing all the evidence, the trial court entered an order on 26 November 2013 denying defendant's motion to dismiss based on its determination that defendant was not an Indian within the meaning of the IMCA. The trial court's order contained hundreds of detailed findings of fact. On 31 January 2014, defendant filed a petition for writ of certiorari with this Court seeking review of the trial court's order. The petition was denied on 11 June 2014.

On 14 March 2016, defendant renewed his motion to dismiss the charges against him in the trial court for lack of jurisdiction, and, in the alternative, moved that the jurisdictional issue relating to his Indian status be submitted to the jury by means of a special verdict. The trial court denied both motions on 25 March 2016.

Defendant was subsequently tried in Superior Court, Jackson County, beginning on 28 March 2016, and was ultimately convicted of armed robbery, first-

degree murder under the felony murder doctrine, and possession of a firearm by a felon. He was sentenced to life imprisonment without parole.

Defendant appealed his convictions to the Court of Appeals. His principal argument on appeal was that the trial court had erred in denying his motion to dismiss on jurisdictional grounds. In a unanimous opinion, the Court of Appeals rejected his argument, based on its determination that defendant did not qualify as an Indian under the IMCA and that a special verdict was not required. *State v. Nobles*, 818 S.E.2d 129 (N.C. Ct. App. 2018).[2] Defendant filed a petition for discretionary review with this Court on 7 August 2018, which we allowed.

**Analysis**

The two issues before us in this appeal are whether the Court of Appeals erred in affirming the trial court's order denying defendant's motion to dismiss and in ruling that the jurisdictional issue was not required to be submitted to the jury by means of a special verdict. We address each issue in turn.

## I. Denial of Motion to Dismiss

The IMCA provides that "[a]ny Indian who commits [an enumerated major crime] against the person or property of another . . . within the Indian country[ ] shall be subject to . . . the exclusive jurisdiction of the United States." 18 U.S.C. § 1153(a); *see United States v. Juvenile Male*, 666 F.3d 1212, 1214 (9th Cir. 2012) ("[The IMCA]

---

[2] The Court of Appeals remanded the case to the trial court for the sole purpose of correcting a clerical error. *Nobles*, 818 S.E.2d at 144. This portion of the Court of Appeals' decision is not before us in this appeal.

provides federal criminal jurisdiction for certain crimes committed by Indians in Indian country."); *United States v. Sands*, 968 F.2d 1058, 1061 (10th Cir. 1992) ("[The IMCA] provides that federal criminal law applies to various offenses committed by Indians . . . 'within the Indian Country.' ").

Here, there is no dispute that the shooting took place in "Indian country" as it occurred within the Qualla Boundary. Nor is there any dispute that the charges against defendant constituted major crimes for purposes of the IMCA. The question before us is whether defendant qualifies as an Indian under that statute.

The IMCA does not provide a definition of the term "Indian." The Supreme Court of the United States, however, suggested a two-pronged test for analyzing this issue in *United States v. Rogers*, 45 U.S. 567, 572–73, 11 L. Ed. 1105, 1107–08 (1846). To qualify as an Indian under the *Rogers* test, a defendant must (1) have "some Indian blood," and (2) be "recognized as an Indian by a tribe or the federal government or both." *United States v. Stymiest*, 581 F.3d 759, 762 (8th Cir. 2009) (citing *Rogers*, 45 U.S. at 572–73, 11 L. Ed. at 1105); *see also United States v. Zepeda*, 792 F.3d 1103, 1113 (9th Cir. 2015) (en banc) ("We hold that proof of Indian status under the IMCA requires only two things: (1) proof of some quantum of Indian blood, . . . and (2) proof of membership in, or affiliation with, a federally recognized tribe.").

In the present case, the parties agree that the first prong of the *Rogers* test has been satisfied because defendant possesses an Indian blood quantum of 11/256 (4.29%). Thus, only the second prong of *Rogers* is at issue—that is, whether defendant

has received tribal or federal recognition as an Indian. This Court has not previously had an opportunity to apply the *Rogers* test. It is therefore instructive to examine how other courts have done so.

In applying the second prong of *Rogers*, both federal and state courts around the country have frequently utilized—in some fashion—the four-factor balancing test first enunciated in *St. Cloud v. United States*, 702 F. Supp. 1456 (D.S.D. 1988). Under the *St. Cloud* test, a court considers the following factors:

> 1) enrollment in a tribe; 2) government recognition formally and informally through providing the person assistance reserved only to Indians; 3) enjoying benefits of tribal affiliation; and 4) social recognition as an Indian through living on a reservation and participating in Indian social life.

*Id.* at 1461; *see, e.g., United States v. Nowlin*, 555 F. App'x 820, 823 (10th Cir. 2014) (using the *St. Cloud* factors to determine whether the defendant was an Indian); *United States v. Bruce*, 394 F.3d 1215, 1223 (9th Cir. 2005) (applying the *Rogers* test as the "generally accepted test for Indian status" as well as the *St. Cloud* factors); *United States v. Lawrence*, 51 F.3d 150, 152 (8th Cir. 1995) (court's analysis of the second *Rogers* prong was "guided by consideration of four factors . . . first enunciated in *St. Cloud*"); *State v. Sebastian*, 243 Conn. 115, 132, 701 A.2d 13, 24 (1997) ("The four factors enumerated in *St. Cloud* have emerged as a widely accepted test for Indian status in the federal courts."); *State v. George*, 163 Idaho 936, 939–40, 422 P.3d 1142, 1145–46 (2018) (relying on the *St. Cloud* factors to determine the

defendant's Indian status); *State v. LaPier*, 242 Mont. 335, 341, 790 P.2d 983, 986 (1990) ("We expressly adopt the foregoing [*St. Cloud*] test."); *State v. Perank*, 858 P.2d 927, 933 (Utah 1992) (relying on *St. Cloud* to determine whether the defendant met the definition of an Indian); *State v. Daniels*, 104 Wash. App. 271, 281–82, 16 P.3d 650, 654–55 (2001) (considering the *St. Cloud* factors in deciding whether the defendant qualified as an Indian).

Courts have varied, however, in their precise application of the *St. Cloud* factors. *See, e.g., State v. Salazar*, No. A-1-CA-36206, 2020 WL 239879, at *3 n.4 (N.M. Ct. App. Jan. 15, 2020) ("[A] circuit split has emerged about whether certain factors carry more weight than others."). Some courts deem the four factors set out in *St. Cloud* to be exclusive and consider them "in declining order of importance." *Bruce*, 394 F.3d at 1224; *accord Sebastian*, 243 Conn. at 132, 701 A.2d at 24 (applying the four *St. Cloud* factors "in declining order of importance"); *LaPier*, 242 Mont. at 341, 790 P.2d at 986 (analyzing the *St. Cloud* factors "[i]n declining order of importance"); *Lewis v. State*, 137 Idaho 882, 885, 55 P.3d 875, 878 (Idaho Ct. App. 2002) ("[Of the *St. Cloud*] factors tribal enrollment is the most important."); *Daniels*, 104 Wash. App. at 279, 16 P.3d at 654 (using the four factors identified in *St. Cloud* "[i]n declining order of importance").

Other courts have utilized the *St. Cloud* factors differently. The Eighth Circuit has held that the four *St. Cloud* factors "should not be considered exhaustive . . . [n]or should they be tied to an order of importance." *Stymiest*, 581 F.3d at 764. The Tenth

Circuit has likewise determined that the *St. Cloud* factors "are not exclusive." *Nowlin*, 555 F. App'x at 823 ("These factors are not exclusive and only the first factor is dispositive if the defendant is an enrolled tribe member.").

After thoroughly reviewing the decisions from other jurisdictions addressing this issue, we adopt the application of the *St. Cloud* factors utilized by the Eighth Circuit and the Tenth Circuit. We do so based on our belief that this formulation of the test provides needed flexibility for courts in determining the inherently imprecise issue of whether an individual should be considered to be an Indian under the second prong of the *Rogers* test. We likewise recognize that, depending upon the circumstances in a given case, relevant factors may exist beyond the four *St. Cloud* factors that bear on this issue. *See, e.g., Stymiest*, 581 F.3d at 764 (holding that the trial court "properly identified two other factors relevant on the facts of this case" in addition to the *St. Cloud* factors—namely, that the defendant's tribe had previously "exercised criminal jurisdiction over" him and that the defendant "held himself out to be an Indian").

Before applying this test in the present case, however, we must first address defendant's threshold arguments. Initially, he contends that consideration of the *St. Cloud* factors is unnecessary because his status as a first descendant conclusively demonstrates—as a matter of law—his "tribal or federal recognition" under the second *Rogers* prong. We reject this argument, however, based on our concern that such an approach would reduce the *Rogers* test into a purely blood-based inquiry,

thereby conflating the two prongs of the *Rogers* test into one. Were we to hold that defendant may be classified as an Indian solely on the basis of (1) his percentage of Cherokee blood; and (2) his status as the son of an enrolled member of the Cherokee tribe, this would transform the *Rogers* test into one based wholly upon genetics. Such an approach would defeat the purpose of the test, which is to ascertain not just a defendant's blood quotient, but also his social, societal, and spiritual ties to a tribe.

Indeed, the Ninth Circuit rejected this exact argument in *United States v. Cruz*, 554 F.3d 840 (9th Cir. 2009), explaining that the four-factor test articulated in *St. Cloud* is designed to probe

> "whether the Native American has a sufficient non-racial link to a formerly sovereign people" . . . . Given that many descendants of Indians are eligible for tribal benefits based exclusively on their blood heritage, the government's argument [that the defendant's descendant status alone could satisfy this prong] would effectively render the second [*Rogers* prong] a de facto nullity, and in most, if not all, cases would transform the entire [*Rogers*] analysis into a "blood test."

*Cruz*, 554 F.3d at 849 (citations and emphasis omitted).

We are likewise unpersuaded by defendant's assertion that we should follow the decision of the Cherokee Court in *E. Band of Cherokee Indians v. Lambert*, 3 Cher. Rep. 62 (N.C. Cherokee Ct. 2003), on this issue. At issue in *Lambert* was whether the defendant in that case qualified as an Indian for purposes of EBCI tribal criminal jurisdiction. *Id*. at 62. The defendant filed a motion to dismiss, contending that the EBCI lacked jurisdiction over her because she was not an enrolled member of the

tribe. *Id*. Both parties stipulated that the defendant was recognized by the tribe as a first descendant. *Id*.

After holding a hearing to gather additional evidence, the court ruled that the defendant was "an Indian for the purposes of [tribal criminal] jurisdiction." *Id*. at 64. The court rejected the defendant's argument that her lack of enrollment in a tribe was dispositive of her status, explaining that "membership in a Tribe is not an 'essential factor' in the test of whether the person is an 'Indian' for the purposes of this Court's exercise of criminal jurisdiction." *Id*. Instead, the court relied on *Rogers* and the *St. Cloud* factors to conclude that "the inquiry includes whether the person has some Indian blood and is recognized as an Indian." *Id*.

The Cherokee Court ruled that "[a]pplying this test in this case, the [c]ourt can only conclude that the [d]efendant meets the definition of an Indian." *Id*. at 65. The court detailed the benefits and privileges available to EBCI first descendants, including "some privileges that only Indians have, [as well as] some privileges that members of other Tribes do not possess." *Id*. at 64. The court also took judicial notice of the fact that the defendant had "availed herself of the [c]ourt's civil jurisdiction" to file a pending lawsuit against another tribal member. *Id*. at 63. Finally, the court noted that "[f]irst [d]escend[a]nts are participating members of [the] community and treated by the [t]ribe as such." *Id*. at 64.

In the present case, we believe that defendant's reliance on *Lambert* is misplaced for several reasons. First, it is far from clear that the *Lambert* court

intended to announce a categorial rule that all first descendants must be classified as Indians. There, despite the parties' stipulation that the defendant was, in fact, an EBCI first descendant, the court nevertheless determined that "additional evidence was required to decide the matter" and proceeded to hold an evidentiary hearing. *Id.* at 62. The logical inference from the court's opinion is that if first descendant status alone was sufficient to decide the issue, the court would have had no need to seek additional evidence in order to determine whether the defendant was subject to tribal jurisdiction. Indeed, we note that the court in *Lambert* expressly made a finding of fact that the defendant had previously "availed herself of the [tribal] [c]ourt's civil jurisdiction" to file a lawsuit against another tribal member. *Id.* at 63. Such a finding would have been unnecessary had the defendant's first descendant status been enough by itself to resolve the issue.

Moreover, even if the Cherokee Court in *Lambert* did intend to articulate such a categorial rule, we would not be bound by it. The court that decided *Lambert* is a trial court within the EBCI judicial system. *See* Cherokee Code § 7-1(a) ("[T]he Trial Court shall be known as the 'Cherokee Court.' "). Defendant has failed to offer any persuasive argument as to why this Court should be bound by the decision of an EBCI trial court on this issue. We note that the Supreme Court of the EBCI has made clear that it "do[es] not consider the Cherokee Court opinions as having any precedential value since the Cherokee Court is the trial court for this appellate court." *Teesateskie v. E. Band of Cherokee Indians Minors Fund*, 13 Am. Tribal Law 180, 188 (E. Cher.

Sup. Ct. 2015). Thus, the decision in *Lambert* does not have binding effect even within the EBCI courts.

Furthermore, as the Idaho Supreme Court has noted, the fact that a tribal court may have exercised its jurisdiction over certain defendants is not dispositive on the issue of whether a state court possesses jurisdiction over such defendants in a particular case. *See George*, 163 Idaho at 940, 422 P.3d at 1146 ("[T]his [c]ourt either has jurisdiction or it does not, and it is not determined by whether other agencies have or do not have jurisdiction or exercise discretion in determining whether to prosecute."). Accordingly, we hold that defendant's status as a first descendant does not—without more—satisfy the second prong of the *Rogers* test.

Having rejected defendant's initial arguments, we now proceed to apply the four *St. Cloud* factors along with any additional factors relevant to the analysis. Before doing so, it is important to emphasize that defendant has not specifically challenged any of the hundreds of findings of fact contained in the trial court's order denying his motion to dismiss. Accordingly, those findings are binding upon us in this appeal. *See State v. Sparks*, 362 N.C. 181, 185, 657 S.E.2d 655, 658 (2008) ("It is well established that if a party fails to object to the [trial court's] findings of fact and bring[s] them forward on appeal, they are binding on the appellate court.").

## A. Enrollment in a Tribe

We first consider whether defendant is enrolled in any "federally recognized tribe." *Zepeda*, 792 F.3d at 1114. Here, the inquiry is a simple one. It is undisputed

that defendant is not enrolled in any such tribe.

## B. Government Recognition Through Provision of Assistance

The second *St. Cloud* factor requires us to determine whether defendant was the recipient of "government recognition formally and informally through receipt of assistance reserved only to Indians." *Cruz*, 554 F.3d at 846. In arguing that this factor supports his argument, defendant lists the types of benefits for which first descendants are eligible. However, this factor is concerned with those tribal benefits a defendant has actually *received* as opposed to those benefits for which he is merely *eligible. See Cruz*, 554 F.3d at 848 (holding that defendant failed to satisfy this prong of the *St. Cloud* test because he "never 'received . . . any benefits from the Blackfeet Tribe' "); *accord United States v. LaBuff*, 658 F.3d 873, 878 (9th Cir. 2011) (rejecting the argument that this factor "could be established by demonstrating eligibility rather than actual receipt of benefits").

Here, based on the trial court's findings of fact, the only evidence of governmental assistance to defendant consisted of five incidents of free medical treatment that he received as a minor at the Cherokee Indian Hospital, a hospital that serves only enrolled EBCI members and first descendants. Defendant's hospital records indicated that he was of EBCI descent and identified him as an "Indian nontribal member." The trial court made no findings as to any tribal assistance that defendant has received since reaching adulthood.

## C. Enjoyment of Benefits of Tribal Affiliation

The third factor under *St. Cloud* addresses defendant's "enjoyment of the benefits of tribal affiliation." *Bruce*, 394 F.3d at 1224. In assessing this factor, we must examine whether defendant has received any broader benefits from his affiliation with a tribe—apart from the receipt of government assistance. *See, e.g., Cruz*, 554 F.3d at 848 (holding that the defendant failed to demonstrate that he "enjoy[ed] any benefits of tribal affiliation" when there was "no evidence that he hunted or fished on the reservation, nor . . . that his employment with the BIA was related to or contingent upon his tribal heritage").

Here, defendant was born in Florida and the trial court made no finding that he was born on tribal land. He did attend a school in the Cherokee tribal school system as a child after he and his mother moved back to North Carolina in the early 1980's, but the school was open to both Indian and non-Indian students. As an adult, defendant lived and worked on or near the Qualla Boundary for approximately fourteen months prior to the murder of Preidt in 2012. The trial court made no findings, however, suggesting that his employment at the restaurant was in any way connected to his first descendant status. Nor does the trial court's order show that he enjoyed any other benefits of tribal affiliation.

## D. Social Recognition as an Indian

Under the fourth *St. Cloud* factor, we consider whether defendant received "social recognition as an Indian through residence on a reservation and participation in Indian social life." *Bruce*, 394 F.3d at 1224. Courts applying this factor have

deemed relevant various types of conduct showing a defendant's connection with a particular tribe. *See, e.g., United States v. Reza-Ramos*, 816 F.3d 1110, 1122 (9th Cir. 2016) (defendant "spoke the tribal language" and "had lived and worked on the reservation for some time"); *LaBuff*, 658 F.3d at 878 ("[Defendant] lived, grew up, and attended school on the Blackfeet Reservation."); *Stymiest*, 581 F.3d at 765–66 (defendant "lived and worked on the Rosebud reservation," told others he was an Indian, and spent significant time "socializing with other Indians"); *Bruce*, 394 F.3d at 1226 (defendant "was born on an Indian reservation and currently lives on one," she "participated in sacred tribal rituals," and her mother and children were enrolled members of a tribe).

Conversely, courts have determined that this factor weighs against a finding of Indian status under the IMCA as to defendants who have never been involved in Indian cultural, community, or religious events; never participated in tribal politics; and have not placed any emphasis on their Indian heritage. *See, e.g., Cruz*, 554 F.3d at 847 (defendant "never participated in Indian religious ceremonies or dance festivals, has never voted in a Blackfeet tribal election, and does not have a tribal identification card"); *Lawrence*, 51 F.3d at 154 (victim was not "recognized socially as an Indian" when she had only lived on the reservation for seven months and "did not attend pow-wows, Indian dances or other Indian cultural events; and . . . she and her family lived without focusing on their Indian heritage").

In the present case—as noted above—defendant lived and worked on or near

the Qualla Boundary for approximately fourteen months prior to the murder of Preidt. During this time, he had a girlfriend, Ashlyn Carothers, who was an enrolled tribal member. Defendant also emphasizes that his two tattoos—which depict an eagle and a headdress—demonstrate his celebration of his cultural heritage.

However, the trial court's findings are devoid of any indication that defendant ever attended any EBCI cultural, community, or religious activities; that he spoke the Cherokee language; that he possessed a tribal identification card; or that he participated in tribal politics. Indeed, we note that Myrtle Driver Johnson, an active elder and member of the EBCI community, testified that she had never seen defendant at EBCI events. Moreover, on several different official documents, defendant self-identified as being "white."

**E. Other Relevant Factors**

Finally, we consider whether any additional pertinent factors exist. For example, whether a defendant has been subjected to tribal jurisdiction in the past—in either a criminal or civil context—has been considered by several courts to be relevant. *See, e.g., LaBuff*, 658 F.3d at 879 (noting "that on multiple occasions, [the defendant] was arrested, prosecuted, and convicted under the jurisdiction of the tribal courts" and that "the assumption and exercise of tribal jurisdiction over criminal charges[ ] demonstrates tribal recognition"); *Stymiest*, 581 F.3d at 766 (observing that the defendant had "repeatedly submitt[ed] [himself] to tribal arrests and prosecutions"); *Bruce*, 394 F.3d at 1226–27 (deeming instructive the fact that the

defendant had been "arrested tribal all her life" because "the tribe has no jurisdiction to punish anyone but an Indian").

Here, the trial court's findings do not show that defendant was ever subjected to the jurisdiction of the EBCI tribal court or, for that matter, any other tribal court. Nor has defendant directed us to any additional facts found by the trial court that would otherwise be relevant under the second prong of the *Rogers* test.

\* \* \*

After carefully considering the trial court's extensive findings of fact in light of the factors relevant to the second prong of the *Rogers* test, we conclude that defendant has failed to demonstrate that the trial court erred in denying his motion to dismiss. In essence, the trial court's findings show that (1) defendant is not enrolled in any tribe; (2) he received limited government assistance from the EBCI in the form of free healthcare services on several occasions as a minor; (3) as a child, he attended a Cherokee school that accepted both Indian and non-Indian students; (4) he lived and worked on the Qualla Boundary for approximately fourteen months as an adult; (5) his participation in Indian social life was virtually nonexistent and his demonstrated celebration of his cultural heritage was at best minimal; (6) he has never previously been subjected to tribal jurisdiction; and (7) he did not hold himself out as an Indian. The trial court therefore properly concluded that defendant was not an Indian for purposes of the IMCA. Accordingly, we affirm the court's denial of his motion to dismiss.

## II.  Special Jury Verdict

The only remaining issue before us concerns defendant's contention that he was entitled to a special jury verdict on the jurisdictional issue underlying his motion to dismiss. Defendant asserts that because this issue required resolution by a jury the trial court erred in ruling on the motion as a matter of law. In support of this contention, he cites our decisions in *State v. Batdorf*, 293 N.C. 486, 238 S.E.2d 497 (1977) and *State v. Rick*, 342 N.C. 91, 463 S.E.2d 182 (1995).

In *Batdorf*, the defendant challenged the trial court's territorial jurisdiction, contending that there was insufficient evidence that his crime was committed in North Carolina—as opposed to Ohio—"so as to confer jurisdiction on the courts of this State." *Batdorf*, 293 N.C. at 492, 238 S.E.2d at 502. We agreed with the defendant that the State bears the "burden of proving beyond a reasonable doubt that the crime with which an accused is charged was committed in North Carolina." *Id.* at 494, 238 S.E.2d at 502. We held that the trial court should have instructed the jury to "return a special verdict indicating lack of jurisdiction" if the jury was not satisfied that the crime occurred in North Carolina. *Id.* at 494, 238 S.E.2d at 503.

*Rick* likewise involved a challenge to the trial court's territorial jurisdiction in which the defendant contended that the State had not sufficiently proven whether the crime occurred in North Carolina or South Carolina. *Rick*, 342 N.C. at 98, 463 S.E.2d at 186. Citing the rule established in *Batdorf*, we determined that a remand was necessary because "the record reveals that although the defendant challenged

the facts of jurisdiction, the trial court did not instruct the jury as to which party bore the burden of proving jurisdiction and that if the jury was unconvinced beyond a reasonable doubt that the murder . . . occurred in North Carolina, it should return a special verdict so indicating." *Id.* at 101, 463 S.E.2d at 187.

Thus, *Batdorf* and *Rick* each involved a challenge to the court's *territorial* jurisdiction—that is, whether the crime occurred in North Carolina as opposed to another state. Here, conversely, defendant is making the entirely separate argument that he was required to be prosecuted in federal court pursuant to the IMCA. As a result, our decisions in *Batdorf* and *Rick* have no application here.

The dissent appears to be arguing that *any* challenge to the trial court's jurisdiction in a criminal case must always be resolved by a jury—regardless of the nature of the jurisdictional challenge or whether any factual disputes exist regarding the jurisdictional issue. Such an argument finds no support in our caselaw and would extend the rulings in *Batdorf* and *Rick* well beyond the limited principle of law for which those cases stand.

The dissent fails to point to any factual dispute relevant to the IMCA analysis that exists in the record.[3] Given the absence of any such factual dispute, it would make little sense to hold that a jury was required to decide the purely legal

---

[3] The dissent similarly does not acknowledge the effect of defendant's failure to challenge on appeal any of the trial court's findings of fact.

jurisdictional issue presented here.

This principle is illustrated by our decision in *State v. Darroch*, 305 N.C. 196, 287 S.E.2d 856 (1982). There, the defendant was convicted of accessory before the fact to murder. *Id*. at 197, 287 S.E.2d at 857. The evidence showed that the defendant, a Virginia resident, had—while in Virginia—hired two persons to kill her husband and that the husband was subsequently killed in North Carolina by the individuals she had hired. *Id*. On appeal, the defendant argued that the trial court lacked jurisdiction over her based on the specific crime for which she had been charged given that the murder had been committed in North Carolina but arranged in another state. *Id*. at 200–01, 287 S.E.2d at 859–60. Relying on *Batdorf*, she contended that because she had raised a jurisdictional issue "the jury should have been allowed to return a special verdict" as to whether jurisdiction existed in the trial court. *Id*. at 212, 287 S.E.2d at 866. In rejecting her argument, we explained as follows:

> While *Batdorf* still represents the law in this state on the burden of proof on jurisdiction, it is applicable only when the facts on which the State seeks to base jurisdiction are challenged. In this case, defendant challenged not the *facts* which the State contended supported jurisdiction, but the *theory* of jurisdiction relied upon by the State. Whether the theory supports jurisdiction is a legal question; whether certain facts exist which would support jurisdiction is a jury question.

*Id*.

As in in *Darroch*, defendant here is not challenging the underlying "facts on which the State seeks to base jurisdiction." *Id*. Instead, defendant contests the trial court's determination that the IMCA is not applicable in this case—an inherently

legal question properly decided by the trial court rather than by the jury.[4]

Finally, the dissent notes that some federal courts have concluded that a defendant's Indian status under the IMCA "is an element of the crime that must be submitted to and decided by the jury" because it is "essential to federal subject matter jurisdiction." *Stymiest*, 581 F.3d at 763. Such a requirement is not illogical given that "federal courts are courts of limited jurisdiction." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374, 57 L. Ed. 2d 274, 282 (1978). The dissent, however, has failed to cite any authority for the converse proposition that in state court proceedings the *inapplicability* of the IMCA is an element of the crime that must be submitted for resolution by the jury. Accordingly, we conclude that the trial court did not err by denying defendant's request for a special jury verdict.

**Conclusion**

For the reasons stated above, we affirm the decision of the Court of Appeals.

AFFIRMED.

---

[4] Therefore, this case does not require us to decide the question of whether a defendant's challenge to a trial court's jurisdiction based on the IMCA could ever require a special jury verdict on that issue in a case where—unlike here—a factual dispute exists that is relevant to the IMCA analysis.

Justice EARLS dissenting.

I disagree with the majority's conclusion that defendant was not entitled to a special jury verdict on the question of whether he is an "Indian" under the Indian Major Crimes Act (the IMCA).[1]  Further, assuming that the majority is correct that this question was not required to be submitted to the jury, I disagree with the majority's conclusion that defendant is not an Indian under the IMCA.  Accordingly, I respectfully dissent.

As the majority notes, the fatal shooting of Barbara Preidt on 30 September 2012 occurred in Jackson County within the Qualla Boundary, which is land that is held in trust by the United States for the Eastern Band of Cherokee Indians (the EBCI), a federally-recognized tribe.  Following an investigation by the Cherokee Indian Police Department (the CIPD), defendant was arrested within the Qualla Boundary in connection with the shooting.

The Cherokee Rules of Criminal Procedure mandated that individuals arrested on tribal land must be brought before a tribal magistrate to "conduct the '*St. Cloud*' test" to determine whether the arrestee is an Indian, and further that if the arrestee is an enrolled member of any federally-recognized tribe or an EBCI First Descendant, jurisdiction lies with the tribal court.  Despite these Rules of Criminal Procedure, CIPD Detective Sean Birchfield did not bring defendant before a tribal magistrate

---

[1] Like the majority, I use the term "Indian" to comport with the terminology contained in the IMCA.

nor ask whether defendant was a First Descendant. Rather, after checking an EBCI enrollment book, which does not include First Descendants, and determining that defendant was not an enrolled member, and after discussing the situation with a Jackson County Assistant District Attorney and a Special Assistant United States Attorney, Detective Birchfield transported defendant to Jackson County, where he was charged in State court with first-degree murder, robbery with a dangerous weapon,. and two counts of possession of a firearm by a felon.

On 15 April 2013, defendant filed a motion to dismiss in superior court, arguing that because he was an Indian under the IMCA, jurisdiction over his case lies exclusively in federal court. After a hearing, the trial court denied defendant's motion on 26 November 2013. Defendant later renewed his motion to dismiss and requested in the alternative that the question of whether he is an Indian be submitted to the jury for a special verdict. The trial court denied these motions on 25 March 2016. On appeal, the Court of Appeals upheld the trial court's rulings, concluding that defendant received a fair trial free from error. *State v. Nobles*, 818 S.E.2d 129 (N.C. Ct. App. 2018).

<u>Special Jury Verdict</u>

Defendant argues that the trial court erred in denying his request for a special jury verdict because he has a constitutional right to a jury trial, with the burden on the State to prove every factual matter necessary for his conviction and sentence beyond a reasonable doubt. In support of his contention, defendant relies, in part,

upon two cases from this Court, *State v. Batdorf*, 293 N.C. 486, 238 S.E.2d 496 (1977), and *State v. Rick*, 342 N.C. 91, 463 S.E.2d 182 (1995).

In *Batdorf*, the defendant argued that there was insufficient evidence that the murder at issue was committed in North Carolina "so as to confer jurisdiction on the courts of this State." 293 N.C. at 492, 238 S.E.2d at 502. The Court stated:

> A defendant's contention that this State lacks jurisdiction may be an affirmative defense in that it presents . . . a matter "beyond the essentials of the legal definition of the offense itself." Jurisdictional issues, however, relate to the authority of a tribunal to adjudicate the questions it is called upon to decide. When jurisdiction is challenged, the defendant is contesting the very power of this State to try him. We are of the view that a question as basic as jurisdiction is not an "independent, distinct, substantive matter of exemption, immunity or defense" and ought not to be regarded as an affirmative defense on which the defendant must bear the burden of proof. Rather, jurisdiction is a matter which, *when contested*, should be proven by the prosecution as a prerequisite to the authority of the court to enter judgment.

*Id.* at 493, 238 S.E.2d at 502 (citations omitted). Thus, the Court held that "when jurisdiction is challenged, as here, the State must carry the burden and show beyond a reasonable doubt that North Carolina has jurisdiction to try the accused." *Id.* at 494, 238 S.E.2d at 502–03.[2]

---

[2] The Court concluded that while the trial court there should have instructed the jury "to return a special verdict indicating lack of jurisdiction" if the jury did not find the killing occurred in North Carolina, the instruction given "afford[ed] [defendant] no just grounds for complaint" because the instruction "properly placed the burden of proof and instructed the jury that unless the State had satisfied it beyond a reasonable doubt that the killing . . . occurred in North Carolina, a verdict of not guilty should be returned." *Batdorf*, 293 N.C. at 494, 238 S.E.2d at 503.

Similarly, in *Rick*, the defendant filed a motion to dismiss for lack of jurisdiction on the basis that there was insufficient evidence that the murder with which he was charged occurred in North Carolina. 342 N.C. at 98, 463 S.E.2d at 186. The Court determined that there was sufficient evidence that the crime occurred in North Carolina, but that in light of *Batdorf* the trial court erred because it "did not instruct the jury as to which party bore the burden of proving jurisdiction and that if the jury was unconvinced beyond a reasonable doubt that the murder, or the essential elements of murder, occurred in North Carolina, it should return a special verdict so indicating." *Id.* at 99–101, 463 S.E.2d at 186–87.

In addressing defendant's argument, the majority suggests that unlike a challenge to a court's "territorial jurisdiction," "defendant is making the *entirely separate* argument that he was required to be prosecuted in federal court pursuant to the IMCA. *As a result*, our decisions in *Batdorf* and *Rick* have no application here." (Emphases added.) Yet, the majority does not explain why the characterization of *Batdorf* and *Rick* as cases involving challenges to "territorial jurisdiction" renders them "entirely separate" and inapplicable to a jurisdictional challenge in the context of the IMCA.[3] It is undisputed that defendant's Indian status has jurisdictional consequences here—that is, if defendant is an Indian under the IMCA, the trial court

---

[3] If the issue was whether the crime occurred "within the Indian country" under the IMCA, I suspect the majority would hesitate to characterize the argument that the state court lacked jurisdiction as "entirely separate," such that, "*[a]s a result*, our decisions in *Batdorf* and *Rick* have no application here." (Emphasis added.)

had no jurisdiction over the case. *See* 18 U.S.C. § 1153(a) (2012); *see also Negonsott v. Samuels*, 507 U.S. 99, 102–03 (1993) ("As the text of § 1153 and our prior cases make clear, federal jurisdiction over the offenses covered by the [IMCA] is 'exclusive' of state jurisdiction." (citations omitted)); *United States v. John*, 437 U.S. 634, 651 (1978) (stating that "the assumption that § 1153 ordinarily is pre-emptive of state jurisdiction when it applies, seems to us to be correct"). Thus, defendant, like the defendants in *Batdorf* and *Rick*, "is contesting the very power of this State to try him." *Batdorf*, 293 N.C. at 493, 238 S.E.2d at 502.

Rather than elaborate on any differences between challenges to "territorial jurisdiction" and challenges to jurisdiction under the IMCA, the majority, shifting gears, alleges that the issue of defendant's Indian status here is a "purely legal" issue and therefore need not be decided by a jury.[4] According to the majority, there is no

---

[4] As defendant is not contending that *Batdorf* and *Rick* require "purely legal" issues to be submitted to the jury, this determination essentially renders the majority's previous paragraph *dicta*. That is—assuming that defendant's challenge here involved only a "purely legal" issue, there would be no need to suggest that *Batdorf* and *Rick* are "entirely separate" and, "[a]s a result," have no application in the context of a challenge to state court jurisdiction on the basis of the IMCA. The majority appears to concede this, stating later in its opinion that "this case does not require us to decide the question of whether defendant's challenge to a trial court's jurisdiction based on the IMCA could ever require a special jury verdict on that issue in a case where—unlike here—a factual dispute exists that is relevant to the IMCA analysis."

"factual dispute relevant to the IMCA analysis."[5] Yet, the majority ignores that under the federal law it purports to follow, a determination of Indian status involves fundamental questions of fact such that a defendant's Indian status itself is a "factual dispute." *See, e.g.*, *United States v. Bruce*, 394 F.3d 1215, 1218 (9th Cir. 2005) (stating that a determination of Indian status is "a mixed question of law and fact"); *see also United States v. Gaudin*, 515 U.S. 506, 511–12 (1995) (rejecting the government's argument that in a prosecution for making material false statements in a matter within the jurisdiction of a federal agency the question of "materiality" is a "legal" question that need not be decided by a jury and stating that the ultimate question of "whether the statement was material to the decision" is an "application-of-legal-standard-to-fact sort of question . . . commonly called a 'mixed question of law and fact,' " which "has typically been resolved by juries"). For example, the majority here expressly adopts the test used by the Eighth Circuit and Tenth Circuit to determine an individual's Indian status for the purposes of the IMCA. *See United States v. Stymiest*, 581 F.3d 759 (8th Cir. 2009); *United States v. Nowlin*, 555 F. App'x 820

---

[5] The majority also notes "defendant's failure to challenge on appeal any of the trial court's findings of fact." This characterization is not wholly accurate, as defendant challenged on appeal numerous findings of fact in the court below. It is true that before this Court defendant has not again raised those challenges to those findings. Yet, given that defendant's argument is that with respect to the question of his Indian status he was entitled to have all facts found, and all evidence weighed, by the jury, I can see little relevance to this issue in his failure to again raise those challenges before this court. For instance, were a trial judge in a prosecution for first degree murder to make findings on the issue of premeditation and deliberation, and refuse to submit that issue to the jury, it would make little difference that the defendant requested a jury instruction on the issue but failed to challenge any of those specific findings. The real dispute here appears to be the extent to which we view a determination of Indian status under the IMCA as inherently involving questions of fact.

(10th Cir. 2014). In these circuits, the courts submit this test—the same one the majority purports to apply here—to the jury to determine whether a defendant is an Indian. *See Stymiest*, 581 F.3d at 763 (stating that "the district court properly denied the motion to dismiss and submitted the issue of Indian status to the jury as an element of the § 1153(a) offense."); *Nowlin*, 555 F. App'x at 823 ("Under the Major Crimes Act, 18 U.S.C. § 1153, the prosecution must prove to the jury that the defendant is an Indian." (citing *Stymiest*, 581 F.3d at 763)).

Briefly addressing this concept, the majority notes that federal courts addressing this issue, where a conviction rests on a determination that the defendant *is* an Indian, have treated the question as an element of the offense, but that here the conviction depends upon a showing that defendant is *not* an Indian, and no state court has considered the inapplicability of the IMCA to be an element of an offense. The fact that in our courts a defendant's Indian status, or lack thereof, may not be an element of the offense does not necessitate a conclusion that this jurisdictional issue need not be submitted to the jury. In fact, this is precisely the import of the Court's decision in *Batdorf*, to wit—that while "[a] defendant's contention that this State lacks jurisdiction presents . . . a matter 'beyond the essentials of the legal definition of the offense itself,' " "the defendant is contesting the very power of this State to try him" and "when jurisdiction is challenged, as here, the State must carry the burden

and show beyond a reasonable doubt that North Carolina has jurisdiction to try the accused." *Batdorf*, 293 N.C. at 493–94, 238 S.E.2d at 502–03.[6]

More importantly, the fact that in our state courts, unlike in federal courts, a defendant's Indian status is not an element of the crime does not transform an otherwise factual inquiry into a question purely of law. The majority is misapprehending the relevance of these federal decisions in which the jury is asked to decide whether the defendant is an Indian—specifically, the majority is explicitly adopting a test that is inherently a mixed question of fact and law appropriate for resolution by a jury,[7] but then denying defendant the right to have the question decided by a jury on the basis that it is a "purely legal" issue.

Certainly, a determination of whether an individual is an Indian for the purposes of the IMCA is a complicated inquiry. As the trial court stated, "deciding who is an 'Indian' has proven to be a difficult question. In fact upon closer examination when one looks to legal precedent the question quickly devolves into a multifaceted inquiry requiring examination into factual areas not normally considered in our courts." This inquiry is particularly complex in that it involves difficult questions of race, including the extent to which a defendant self-identifies as

---

[6] Under *Batdorf*, the fact that a defendant's Indian status is not an element of the crime in our state courts would be relevant in prosecutions in which the defendant did not challenge jurisdiction, in which case the State would be relieved of its burden to prove jurisdiction beyond a reasonable doubt.

[7] After all, federal courts are not in the habit of submitting "purely legal" issues to the jury. As the majority itself notes, "it would make little sense" to submit questions strictly of law to the jury.

an Indian, as well as credibility determinations regarding instances of self-identification.[8]  Nonetheless, in view of the fact that the test employed by federal courts, and adopted today by the majority, requires an inherently factual inquiry, as well as the fact that our precedent requires jurisdiction, when contested, to be submitted to the jury and proven beyond a reasonable doubt, I must respectfully dissent from the majority's conclusion on this issue.

<u>Denial of Motion to Dismiss</u>

Assuming *arguendo* that defendant is not entitled to have the issue of his Indian status submitted to the jury, I disagree with the majority that the trial court correctly found that defendant was not an Indian under the IMCA.  Applying the second prong of the *Rogers* test using the application of the *St. Cloud* factors utilized by the Eighth Circuit and Tenth Circuit, I would conclude that defendant is an Indian under the IMCA.

First, I disagree with the majority's reading of *Eastern Band of Cherokee Indians v. Lambert*, 3 Cher. Rep. 62 (N.C. Cherokee Ct. 2003), in which the Cherokee tribal court addressed whether the defendant was an Indian under the *Rogers* test such that the tribal court could exercise criminal jurisdiction over the defendant.[9]

---

[8] For example, the trial court found that while defendant claimed "at certain times to be white/Caucasian and then at other times to be Indian," the "variations," including the use on two occasions of different social security numbers "necessarily call[ ] into question the veracity of Defendant."

[9] The tribal court's criminal jurisdiction over the defendant depended upon whether the defendant was an "Indian" under the Indian Civil Rights Act, which defines "Indian" by reference to the meaning of an Indian under the IMCA.  25 U.S.C. § 1301(4).

The majority states that because the parties stipulated that the defendant was an EBCI First Descendant, but nevertheless determined that additional evidence was necessary and therefore conducted an evidentiary hearing, "[t]he logical inference is that if first descendant status alone was sufficient to decide the issue, the court would have had no need to seek additional evidence in order to determine whether the defendant was subject to tribal jurisdiction." Given that the tribal court had not previously addressed this question, the logical inference in my view is that the court needed additional evidence because this was an issue of first impression for the tribal court. This is particularly apparent given that essentially all of the tribal court's findings from that evidence address first descendants generally:

1. The Defendant, Sarella C. Lambert is not an enrolled member of any federally recognized Indian Tribe.

2. The Defendant, Sarella C. Lambert is recognized by the Eastern Band of Cherokee Indians as a "First Lineal Descendent" (First Descendent).

3. To be an enrolled member of the Eastern Band of Cherokee Indians, one must have at least one ancestor on the 1924 Baker roll of tribal members and possess at least one sixteenth blood quanta of Cherokee blood.

4. A First Descendent is a child of an enrolled member, but who does not possess the minimum blood quanta to remain on the roll.

5. A First Descendent may inherit Indian Trust property by testamentary devise and may occupy, own, sell or lease it to an enrolled member during her lifetime. C.C. § 28-2. However, she may not have mineral rights or decrease the value of the holding. C.C. § 28-2(b).

6. A First Descendent has access to the Indian Health Service for health and dental care.

7. A First Descendent has priority in hiring by the Tribe over non-Indians, on a par with enrolled members of another federally recognized Tribe as part of the Tribe's Indian preference in hiring.

8. A First Descendent has access to Tribal funds for educational purposes, provided that funds have not been exhausted by enrolled members.

9. A First Descendent may use the appeal process to appeal administrative decisions of Tribal entities.

10. A First Descendent may appear before the Tribal Council to air grievances and complaints and will be received by the Tribal Council in relatively the same manner that an enrolled member from another Indian Nation would be received.

11. Other than the Trust responsibility owed to a First Descendent who owns Indian Trust property pursuant to C.C. § 28-2, the United States Department of the Interior, Bureau of Indian Affairs has no administrative or regulatory responsibilities with regard to First Descendents.

12. A First Descendent may not hold Tribal elective office.

13. A First Descendent may not vote in Tribal elections.

14. A First Descendent may not purchase Tribal Trust land.

15. The Court takes judicial notice of its own records, and specifically of the fact that the Defendant has availed herself of the Court's civil jurisdiction in that she is the Plaintiff in the case of Sarella C. Lambert v. Calvin James, CV-99-566, a case currently pending on

the Court's civil docket.

16. The Defendant was charged with a proper warrant and criminal complaint for Domestic Violence Assault pursuant to C.C. §§ 14-40.1(b)(6) and 14-40.10.

17. C.C. § 14-1.5 provides "The Cherokee Court system shall have the right to hear cases, impose fines and penalties on non members as well as members."

*Lambert*, 3 Cher. Rep. at 62–63. The majority holds up Finding of Fact 15 as proof that the tribal court was making its determination based on more than the defendant's mere status as a first descendant. Yet, the majority ignores the relevance of this finding to the court's analysis:

> The same concept is true here. By political definition First Descendents are the children of enrolled members of the EBCI. They have some privileges that only Indians have, but also some privileges that members of other Tribes do not possess, not the least of which is that they may own possessory land holdings during their lifetimes, if they obtain them by will. During this time, the Government will honor its trust obligations with respect to First Descendents who own Tribal Trust lands. Also, First Descendents have access to Tribal educational funds, with certain limitations, and may appeal the adverse administrative decisions of Tribal agencies. Like members of other tribes, First Descendents may apply for jobs with the EBCI and receive an Indian preference and they may also address the Tribal Council in a similar manner as members of other Tribes. *Of course, it almost goes without saying that First Descendents may, as this Defendant has, seek recourse in the Judicial Branch of Tribal Government.* Most importantly, according to the testimony of Councilwoman McCoy, First Descendents are participating members of this community and treated by the Tribe as such.

*Id.* at 64 (emphasis added). In *Lambert*, the tribal court plainly ruled that first descendants are Indians.

As the tribal court stated later that same year, "this Court . . . held [in *Lambert*] that first lineal descendants, children of enrolled members who do not possess sufficient blood quanta to qualify for enrolment [sic] themselves are nevertheless subject to the criminal jurisdiction of the Court." *In re Welch*, 3 Cher. Rep. 71, 75 (N.C. Cherokee Ct. 2003) (citation omitted); *see also E. Band of Cherokee Indians v. Prater*, 3 Cher. Rep. 111, 112–13 (N.C. Cherokee Ct. 2004) (citing *Lambert* as "[h]olding that First Lineal Descendants are Indians for the purposes of the exercise of [the tribal court's] jurisdiction"). The tribal court's position that first descendants are Indians is also reflected here in the trial court's findings regarding the Cherokee Rules of Criminal Procedure, which provided that when a tribal magistrate conducts the *St. Cloud* test, if a defendant is a First Descendant, "the inquiry ends there and the Court has jurisdiction over the defendant."

While I agree with the majority that the fact that a tribal court has exercised its jurisdiction over certain defendants is not dispositive of the issue, significant weight should be attributed to these tribal determinations that First Descendants are Indians, particularly in a test that is, at bottom, designed to determine whether an individual is "recognized as an Indian by [the] tribe." *Stymiest*, 581 F.3d at 762 (citing *United States v. Rogers*, 45 U.S. at 567, 572–73 (1846)). Yet, while the majority discusses *Lambert* in rejecting the notion that it alone satisfies the second

prong of the *Rogers* test, the majority omits any mention of *Lambert*, the subsequent tribal court decisions, or the Cherokee Rules of Criminal Procedure, in its balancing of the *St. Cloud* factors.

Next, the trial court and the majority both, in my view, ignore the significance of the fact that defendant was incarcerated for nearly twenty years. The trial court's findings demonstrate that defendant was born in Florida on 17 January 1976. When defendant was an infant, his father abandoned him with his maternal uncle, Mr. Furman Smith Crowe, an enrolled member of the EBCI. Defendant's mother returned from Florida in the early 1980's and lived with defendant until at least 1990, at which time they moved back to Florida. Defendant was convicted in Florida on 28 January 1993 at the age of seventeen years old and was imprisoned there until his release on 4 November 2011, at which time he returned to North Carolina and eventually began living on or around the Qualla Boundary. Defendant was arrested on 30 November 2012 and has been imprisoned since that time. In short, defendant— now forty-four years old—has lived only about eighteen years of his life outside of prison. During the large majority of that time defendant was a minor and lived on or near the Qualla Boundary.

Here, in addressing the extent to which defendant received government assistance reserved for Indians, the trial court made findings regarding the five separate instances that defendant, on the basis of his First Descendant status, received free medical treatment from Cherokee Indian Hospital ranging from when

he was nine to fourteen years old, but then found that "there are no other records of accessing any other clinics or medical facilities overseen or related to the CIH for over 23 years." Similarly, in addressing how defendant enjoyed the benefits of tribal affiliation, the trial court found that "save however for use of medical services a quarter of a century ago Defendant has not demonstrated use of any of his rights as a First Descendant of the Eastern Band of Cherokee" and that "Defendant has never 'enjoyed' these opportunities [afforded to First Descendants] which were made available for individuals similarly situated." The majority stresses these findings, stating that "[t]he trial court made no findings as to any tribal assistance that defendant has received since reaching adulthood." While I recognize that defendant's incarceration was a result of his own conduct, the fact that during the vast majority of those previous twenty-three years defendant was wholly incapable of receiving further tribal assistance or enjoying benefits of tribal affiliation is salient, particularly in a test that is, again, geared towards determining whether an individual is "recognized as an Indian by [the] tribe." *Stymiest*, 581 F.3d at 62 (citing *Rogers*, 45 U.S. at 572–73). The extent to which defendant received tribal assistance and enjoyed the benefits of affiliation when he was actually at liberty to do so should, in my view, weigh more heavily in such an analysis.

The disregard for defendant's incarceration similarly pervades other portions of the majority's analysis. For example, the majority finds it significant that the trial court's findings are devoid of any indication that he participated in tribal politics.

Given that defendant has spent the majority of his life outside of prison living on the Qualla Boundary, but that he was over the age of eighteen for less than a year of that time, I can see little significance in his lack of participation in tribal politics in terms of measuring his "social recognition as an Indian." *St. Cloud v. United States*, 702 F. Supp. 1456, 1461 (D.S.D. 1988).

In sum, I would conclude that defendant has been "recognized by a tribe" and is an Indian for the purposes of the IMCA.[10] Of particular note, in my view, are the tribal court decisions and Cherokee Rules of Criminal Procedure providing that first descendants are subject to the tribal court's criminal jurisdiction on the basis that they are Indians under *Rogers* and the IMCA, as well as the findings that defendant has lived the large majority of his non-incarcerated life on or around the Qualla Boundary and during that time received free hospital care and attended Cherokee school.

## Conclusion

For the reasons stated, I respectfully dissent from the majority's decision. I would reverse and remand for a new trial, at which defendant is entitled to have the question of his Indian status submitted to the jury. In the alternative, assuming that

---

[10] With respect to the findings regarding defendant's tattoos, the extent to which his claims of being an Indian are potentially contradicted by other instances of identifying as "white/Caucasion," including by signing his name to probation documents that listed him as "white," and his living on or around the Qualla Boundary and dating a woman who is an enrolled tribal member—to the extent that the majority relies upon these in determining that defendant did not demonstrate any legitimate celebration of his cultural heritage and did not genuinely hold himself out as an Indian, this reliance undercuts its determination that this inquiry is a purely legal, rather than factual, determination.

defendant is not entitled to have the question of his Indian status submitted to the jury, I would reverse the trial court and conclude that the trial court lacks jurisdiction on the basis that defendant is an Indian under the IMCA.